FILED
United States Court of Appeals
Tenth Circuit

July 27, 2009

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

ALVIN HUTCHINSON, a/k/a Big Al,

Defendant-Appellant.

No. 07-1204

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

LEE ARTHUR THOMPSON, a/k/a
"LT",

Defendant-Appellant.

No. 07-1230

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JUNIOR RAY MONTOYA,

Defendant-Appellant.

No. 07-1234

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

WILLIAM L. GLADNEY, a/k/a "L",

    Defendant-Appellant.

No. 07-1264

---

**Appeals from the United States District Court
for the District of Colorado
(D.C. No. 05-CR-00141-MSK)**

---

Howard A. Pincus, Assistant Federal Public Defender (Raymond P. Moore with him on the briefs), Denver, CO, for Defendant-Appellant Alvin Hutchinson.

Nancy L. Simmons, Law Offices of Nancy L. Simmons, P.C., Albuquerque, NM, for Defendant-Appellant Lee Arthur Thompson.

Wade H. Eldridge, Denver, CO, for Defendant-Appellant Junior Ray Montoya.

Dennis W. Hartley, Dennis W. Hartley, P.C., Colorado Springs, CO, for Defendant-Appellant William L. Gladney.

James C. Murphy, Assistant United States Attorney (Troy A. Eid, United States Attorney with him on the brief), Denver, CO, for Plaintiff-Appellee United States in Case No. 07-1204.

John M. Hutchins, Assistant United States Attorney (Troy A. Eid, United States Attorney; Gregory Rhodes, Assistant United States Attorney; Jaime A. Pena, Assistant United States Attorney with him on the brief), Denver, CO, for Plaintiff-Appellee United States in Case Nos. 07-1230, 07-1234, 07-1264.

---

Before **GORSUCH, McKAY,** and **BALDOCK**, Circuit Judges.

- 2 -

**GORSUCH**, Circuit Judge.

Denver's Alpine Rose Motel was something of a "drive-thru" crack market. Customers needed only to pull their cars into the parking lot to receive window-side service from one of the motel's resident drug runners. A runner would take the customer's order, proceed to different motel rooms occupied by crack dealers until he found sufficient quantities to fill the order, and then make the delivery. So-called enforcers helped keep the peace among the motel's residents. Two leaders of the operation replenished the various dealers' drug supply on a daily basis and mediated disputes. A peculiar sort of community spirit evolved, with a Mother's Day "crack scramble" and an Easter egg hunt with rocks of crack substituted for eggs. The business model proved highly successful—some 100 customers visited each day at the height of the motel's crack dealing operation in the summer of 2004.

The government brought a variety of charges against several of those involved in the Alpine Rose operation, including counts under the Racketeer Influence and Corrupt Organizations Act. Eventually, the district court held four trials that resulted in the conviction of the defendants-appellants now before us: Alvin Hutchinson, Lee Arthur Thompson, Junior Ray Montoya, and William L. Gladney. Each of these individuals raises different challenges to his conviction

or sentence, ranging from contesting the adequacy of the district court's jury instructions to disputing that court's compliance with the Speedy Trial Act. In the main, we affirm the district court's disposition of these complex matters.

I

A

Viewed, as it must be, in the light most favorable to the government as the prevailing party, the evidence shows that the Alpine Rose motel was a hub of drug activity for years, but that business really ratcheted up in 2004 when Lee Arthur Thompson and Alvin Hutchinson moved in. Mr. Thompson, known to the residents of the Alpine Rose as "LT," was a crack supplier who made two regular, daily deliveries of product to the motel. Mr. Thompson's best customer was Mr. Hutchinson, a prolific dealer at the Alpine Rose. But the relationship between Mr. Thompson and Mr. Hutchinson was more than that of just seller and buyer. One resident of the motel familiar with the drug operation described Mr. Hutchinson as Mr. Thompson's "right-hand man," H. Vol. XXIII at 404;[1] another described Mr. Hutchinson's role by saying "[h]e was right under [Mr. Thompson]," H. Vol. XXII at 195. Together, Mr. Thompson and Mr. Hutchinson acted as authority figures, directing the drug trade at the Alpine Rose. Other

[1] Record citations begin with the first initial of the last name of the relevant defendant. For example, "H. Vol. XXIII at 404" indicates a citation to the record from Mr. Hutchinson's proceedings.

individuals never gave orders to Mr. Thompson or Mr. Hutchinson. Even the owner of the motel, Jorge Banuelos, a drug addict who purchased from Mr. Thompson, followed orders given by Mr. Thompson, his tenant.

Other Alpine Rose residents, following the lead of Mr. Thompson and Mr. Hutchinson, performed a variety of roles. Some, the dealers, received drugs from Mr. Thompson and Mr. Hutchinson and resold them to street-level customers. Others, including Junior Ray Montoya, were runners who worked on behalf of the dealers as a sort of car-side waiter service, taking orders from customers sitting in their cars in the motel's parking lot, retrieving drugs from dealers located in the motel's various rooms, and then delivering the drugs to the waiting customers. In return for their labor, runners were entitled to keep a small piece of the delivered drug. Other individuals at the motel, widely known as enforcers, ensured that motel residents abided Mr. Thompson's and Mr. Hutchinson's directions.

Mr. Thompson and Mr. Hutchinson exercised significant control over the lives of the motel's residents. They decided who could live at the motel and who could not. They oversaw day-to-day aspects of the drug trade, and they mediated customer complaints. For example, when a customer complained that Mr. Montoya had tried to cheat him in a crack purchase, the customer complained to Mr. Thompson; Mr. Thompson rebuked Mr. Montoya; and Mr. Thompson then gave the customer twice the crack he sought to settle the dispute.

Mr. Thompson and Mr. Hutchinson ruled in large measure through the threat and use of violence. By way of illustration, Mr. Hutchinson arranged for several enforcers to beat up a runner named Marlo Johnson because Mr. Johnson slapped one of the dealer's sons. On a different occasion, Mr. Thompson directed a group of enforcers to attack Paul Rose, another motel resident, because he borrowed money from one of Mr. Thompson's girlfriends against Mr. Thompson's wishes. Mr. Thompson and Mr. Hutchinson also used violence against the outside world: they enlisted residents of the motel to use violence on their behalf to collect debts, and armed their lieutenants to drive away from the Alpine Rose rival drug dealers who threatened their commercial dominance of the area's drug trade.

Despite the occasional use of violence against and among residents, a kind of community spirit developed at the Alpine Rose. Mr. Thompson and Mr. Hutchinson organized cookouts, inviting all of those involved in the drug business at the motel to attend. At these gatherings, Mr. Thompson and Mr. Hutchinson provided food for everyone and gave away drugs as prizes. Mr. Thompson organized a "crack scramble" on Mother's Day, throwing crack from a balcony onto the parking lot for the mothers in attendance to grab. H. Vol. XXII at 151. Mr. Thompson also organized an Easter egg hunt, though with the traditional egg replaced by a "big rock of crack cocaine." *Id.* at 154. One resident who attended

these parties compared the atmosphere to a "company picnic." H. Vol. XXIII at 416. Mr. Hutchinson held frequent 6 a.m. meetings in his room. Dubbed "Sunrise at Al's," these meetings were attended by, in one resident's words, "[e]verybody at the motel." H. Vol. XXII at 155-56. Mr. Hutchinson supplied food, and the residents would discuss business and play dice games, with crack as the prize. Residents regularly visited each other's rooms to share food, play games, and take drugs together. As one dealer described the atmosphere at the Alpine Rose, residents "support[ed] each other, to keep the customers coming, keep the people coming. It wasn't really a big competition. Everybody was out there to sell drugs, make money. And we just worked together." H. Vol. XXIII at 374.

The residents also helped each other avoid the police. Mr. Thompson, Mr. Hutchinson, and a few other residents had surveillance devices that transmitted live footage of the parking lot and surrounding areas to television monitors in their rooms. If residents became aware of police presence through either the surveillance devices or observation, they notified others in the motel using cell phones or walkie-talkies. Mr. Thompson expected residents to notify him and others if they became aware of either a police presence or some other disturbance.

William Gladney, one of the defendants before us and a dealer at the Alpine Rose, unwittingly played a role in the demise of the motel's drug operations. Mr.

Gladney opened up shop and sold drugs out of his room at the motel after Mr. Thompson and Mr. Hutchinson established their operation. When Mr. Thompson and Mr. Hutchinson ran out of drugs, the dealers who normally depended on them for supply sometimes turned to Mr. Gladney, who had another, outside source of supply. Though the relationship between Mr. Gladney and Mr. Thompson was strained, Mr. Gladney and Mr. Hutchinson were friends and used drugs together. On October 23, 2004, Marlo Johnson sought to purchase drugs from Mr. Gladney. Mr. Gladney was not in his room, but Dino DeHerrera, Mr. Gladney's lookout, gave Mr. Johnson drugs. Mr. Johnson later returned to the room, complaining that he had been shorted. Apparently upset by the challenge to his (and his lookout's) honor, Mr. Gladney responded by shooting and killing Mr. Johnson. Mr. Gladney later told Mr. DeHerrera that he did so to set an example for other "punks." G. Vol. V at 819-20.

The shooting was not good for business, and most of those involved in the drug operation at the Alpine Rose, including Mr. Thompson and Mr. Hutchinson, began drifting away from the motel. Still, some aspects of the operation continued: Mr. Thompson kept supplying Mr. Hutchinson with crack, which Mr. Hutchinson and others sold from a new address, and when members of the Alpine Rose were eventually arrested, Mr. Thompson posted bail for them.

B

After the murder, law enforcement traced several of the former Alpine Rose residents to a house on 96th and Federal in Denver. Officers raided the house and found Mr. Hutchinson there. Officers separately arrested Mr. Thompson and Mr. Montoya the same day; Mr. Gladney's arrest followed a few months later. At the end of it all, the government obtained a second superseding indictment charging eight individuals for their roles in the drug operation at the Alpine Rose. Seven elected to go to trial: Mr. Thompson, Mr. Hutchinson, Mr. Gladney, and Mr. Montoya, as well as Steven Ellis, Cecilia Lozano, and Jessica Cruthers. After considering various motions for severance, the district court initially decided to hold four separate trials: (1) Mr. Hutchinson alone; (2) Mr. Thompson and Mr. Gladney together; (3) Mr. Ellis alone; and (4) Ms. Lozano, Ms. Cruthers, and Mr. Montoya together.

At the trial of Ms. Lozano, Ms. Cruthers, and Mr. Montoya, the jury acquitted Ms. Lozano of drug conspiracy, but convicted her of distribution. Ms. Cruthers was found guilty of one count of drug distribution. Mr. Montoya conceded guilt on two drug distribution charges, but the jury was unable to reach a verdict on conspiracy charges against him or Ms. Cruthers, so the district court declared a mistrial. Ms. Cruthers subsequently pled guilty to the conspiracy count and was not retried. Because Ms. Lozano was acquitted of drug conspiracy and

convicted of drug distribution, she was not retried. But this still left Mr. Montoya to be retried.

This time, the district court opted to try Mr. Montoya alongside Mr. Thompson and Mr. Gladney. In doing so, the district court concluded that the risk of spillover prejudice from being tried with defendants facing more serious charges could be abated by curative instructions. It also found that the risk of prejudice was, in any event, outweighed by the inconvenience, expense, and consumption of judicial resources that would be associated by holding yet another, fifth, separate trial lasting between two and three weeks. This second jury convicted Mr. Montoya of conspiracy.

The same jury that convicted Mr. Montoya also convicted Mr. Thompson of violating RICO, operating a continuing criminal enterprise ("CCE"), conspiring to distribute and distributing drugs, laundering money, possessing with intent to distribute, being a felon in possession of a weapon, and tampering with evidence. This jury, too, found Mr. Gladney guilty of a RICO violation, drug conspiracy, and using a firearm during and in relation to a drug trafficking crime. In his separate trial, a jury convicted Mr. Hutchinson of a RICO violation, a CCE violation, drug conspiracy, and five additional counts of crack cocaine distribution. Likewise, in his separate trial, Mr. Ellis was found guilty of

possession with intent to distribute less than 5 grams of cocaine base and aiding and abetting in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) and 18 U.S.C. § 2.

Mr. Hutchinson, Mr. Thompson, Mr. Montoya, and Mr. Gladney now appeal their convictions or sentences. We address each appellant's arguments in turn, beginning with Mr. Hutchinson's.

II

Mr. Hutchinson brings two challenges to his convictions. First, he contends that the district court failed to instruct the jury properly with respect to RICO's enterprise element. Second, he alleges that his convictions for drug conspiracy and engaging in a continuing criminal enterprise violate the Double Jeopardy Clause. We conclude that Mr. Hutchinson's first argument does not merit reversal, but that his drug conspiracy and CCE convictions must be reversed and remanded for the district court to vacate the conviction on one of the charges.

A

In assessing a claim of instructional error, normally we will reverse when "(1) we have substantial doubt whether the instructions, considered as a whole, properly guided the jury in its deliberations; and (2) when a deficient jury instruction is prejudicial." *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1093 (10th Cir. 2007). Because Mr. Hutchinson did not object to the court's RICO enterprise instruction at trial, however, he concedes that our review is

confined to plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Hasan*, 526 F.3d 653, 660-61 (10th Cir. 2008). Under that standard, Mr. Hutchinson is entitled to relief only if he can show that the district court's jury instruction constituted (1) error, (2) that is plain, and (3) affects his substantial rights, as well as (4) the fairness, integrity, or public reputation of judicial proceedings. *Hasan*, 526 F.3d at 661. In light of the Supreme Court's recent decision in *Boyle v. United States*, 129 S. Ct. 2237 (2009), we cannot say the district court's RICO instruction was error at all, let alone reversible error under the onerous standard Mr. Hutchinson must meet.

RICO makes it a crime for individuals to engage in a pattern of racketeering as part of "an enterprise,"[2] and proof of such an enterprise naturally is essential to securing a conviction under the statute. *Id.* at 2243. After Congress enacted RICO, however, the circuits promptly split about the meaning and reach of the enterprise element. Must an enterprise be a formal legal entity? Or may the term also encompass looser, less formal groups? The Supreme Court provided guidance on this question in *United States v. Turkette*, 452 U.S. 576 (1981). There, the Court held that "enterprises" include not just legal entities but

---

[2] Under 18 U.S.C. § 1962(c), it is a crime "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

"any union or group of individuals associated in fact although not a legal entity," *id.* at 579 n.2 (quoting 18 U.S.C. § 1961(4)), adding that RICO enterprises embrace any "group of persons associated together for a common purpose of engaging in a course of conduct," *id.* at 583. Such so-called association-in-fact enterprises, the Court explained, may be "proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Id.*

It is this sort of informal, association-in-fact enterprise that Mr. Hutchinson was charged with leading at the Alpine Rose, and about which the district court had to instruct the jury. Yet, while *Turkette* clarified much about the contours of RICO's enterprise element, it did not resolve everything. Mirroring what happened in the wake of RICO's passage, shortly after *Turkette* the circuits again promptly split. This time they debated, among other things, how much "structure" an association-in-fact enterprise must display to distinguish it from a RICO "pattern of racketeering," in order to distinguish these distinct statutory elements. Some courts, like the Third Circuit in *United States v. Riccobene*, 709 F.2d 214, 222 (3d Cir. 1983), required more proof of an enterprise's structure; others, like the Second Circuit in *United States v. Boyle,* 2007 WL 4102738 (2d Cir. 2007), required less. *See also* Jed. S. Rakoff & Howard W. Goldstein, <u>RICO: Civil and Criminal Law and Strategy</u>, at 1.05[1]-[3] (2007) (outlining circuit splits).

- 13 -

For our part, in *United States v. Smith*, 413 F.3d 1253 (10th Cir. 2005), we sided with the Third Circuit and those courts requiring more rather than less "structure." We held that, to distinguish the RICO enterprise element from the statute's pattern of racketeering activity, the government must prove: (1) the existence of a decision-making framework or mechanism for controlling the group, (2) that various associates functioned as a continuing unit, and (3) that the enterprise had an existence separate and apart from the pattern of racketeering activity. *Id.* at 1266-67. On appeal before us, Mr. Hutchinson complains that the district court's jury instructions did not adequately take account of *Smith*. At trial, the jury was instructed that an association-in-fact enterprise

> includes a group of people associated for a common purpose of engaging in a course of conduct over a period of time. This group of people does not have to be a legally recognized entity such as [a] partnership or corporation. This group may be organized for a legitimate and lawful purpose, or it may be organized for an unlawful purpose. This group of people must have (1) a common purpose and (2) an ongoing organization, either formal or informal, and (3) personnel who function as a continuing unit.

H. Vol. XXVII at 914. Mr. Hutchinson complains that this instruction makes no mention of the first or third *Smith* requirements—no mention of the need for a decision-making framework or mechanism for controlling the group, and no mention of the need for the enterprise's existence separate and apart from the pattern of racketeering activity.

- 14 -

Whatever we once might have said about the merits of Mr. Hutchinson's arguments, the world now looks very different after the Supreme Court's recent decision in *Boyle*. Addressing the circuit split that arose in *Turkette*'s wake, the Supreme Court in *Boyle* sided with the Second Circuit and against the side of the split with which we enlisted in *Smith*, eschewing both requirements Mr. Hutchinson seeks to take the district court to task for failing to discuss.

First, the Supreme Court saw "no basis" in the language of the statute to require the government to prove some decision-making framework or mechanism for controlling the group; a RICO enterprise, the Court held, "need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc." *Boyle*, 129 S. Ct. at 2245. "Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, [or] established rules and regulations . . . ." *Id.*

Second, the Court held that, while the enterprise and pattern of racketeering activity are "of course" separate elements under RICO, such that "proof of one does not necessarily establish the other," *id.* (quoting *Turkette*, 452 U.S. at 583), at the same time "evidence used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may in particular cases coalesce.'" *Id.*

- 15 -

(quoting *Turkette*, 452 U.S. at 583). Accordingly, "a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach." *Id.* at 2246. The district court in *Boyle* was thus correct when it informed the jury both that it could find an enterprise "where an association of individuals, without structural hierarchy, form[ed] solely for the purpose of carrying out a pattern of racketeering acts," and that "[c]ommon sense suggests that the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure." *Id.* at 2242 (alterations in original). Simply put, after *Boyle*, an association-in-fact enterprise need have no formal hierarchy or means for decision-making, and no purpose or economic significance beyond or independent of the group's pattern of racketeering activity. *See also id.* at 2244-45 (rejecting a proposed requirement that the jury be told an enterprise's structure must be "ascertainable" on the ground that such an instruction is "redundant and potentially misleading").

In lieu of the structural requirements *Smith* once imposed, the Supreme Court announced a new test for determining whether a group has sufficient structure to qualify as an association-in-fact enterprise. Under this test, a group must have "[1] a purpose, [2] relationships among those associated with the enterprise, and [3] longevity sufficient to permit these associates to pursue the

enterprise's purpose." *Boyle*, 129 S. Ct. at 2244. The Court explained the statutorily pertinent "purpose" by reference to its decision in *Turkette*, commenting that members of the group must share the "common purpose of engaging in a course of conduct." *Id.* at 2243 (quoting *Turkette*, 452 U.S. at 583) (internal quotation mark omitted). As to the relevant "relationship," the Court explained that not only must members of the group only share a common purpose, there also must be evidence of "interpersonal relationships" aimed at effecting that purpose—evidence that the members of the group have "joined together" to advance "a certain object" or "engag[e] in a course of conduct." *Id.* at 2244. As to longevity, the Court held that the group must associate on the basis of its shared purpose for a "sufficient duration to permit an association to 'participate' in [the affairs of the enterprise] through 'a pattern of racketeering activity,'" *id.* (quoting 18 U.S.C. § 1962), though "nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence," *id.* at 2245. The Court acknowledged that its structural requirements for an enterprise are modest, certainly far more modest than *Riccobene*'s or *Smith*'s, but stressed that this result is compelled by the plain language of Congress's statute: "This enumeration of included enterprises is obviously broad, encompassing [in RICO's plain language terms] '*any . . .* group of individuals associated in fact.'" *Id.* at 2243 (quoting 18 U.S.C. § 1961(4)) (final alteration in

original) (emphasis in original). "The term 'any' ensures that the definition has a wide reach, . . . and the very concept of an association in fact is expansive. In addition, the RICO statute provides that its terms are to be 'liberally construed to effectuate its remedial purposes.'" *Id.* (quoting Pub. L. No. 91-452 § 904(a), 84 Stat. 947).

*Boyle*'s test now governs the disposition of this and future RICO cases in our circuit, and whether or not they might have satisfied *Smith*, we have no doubt that the district court's jury instructions satisfy *Boyle*. The district court obliged the government to show that the members of the alleged enterprise shared a common purpose, that they interacted or associated in some way to advance this shared purpose, and that the members of the enterprise so functioned long enough to complete a pattern of racketeering activity. After *Boyle*, no more is required to show that an enterprise has the requisite structure. Neither was any special formulaic instruction or particular incantation required to convey *Boyle*'s test; the Court has stressed that it isn't concerned with the specific wording of a district court's instructions so long as they "adequately t[ell]" the jury what it needs to find. *Id.* at 2247; *see also Williams*, 497 F.3d at 1093-94 (allowing the district court significant leeway in the specific words of its instructions). The Court approved the district court's instructions in *Boyle*, which informed the jury that it had to find "an ongoing organization with some sort of framework, formal or

informal, for carrying out its objectives" in which "various members and associates of the association function[ed] as a continuing unit to achieve a common purpose." *Boyle*, 129 S. Ct. at 2247 (alteration in original). The nearly identical instructions in our case surely can be no less acceptable.

B

Mr. Hutchinson's second argument for reversal can be more succinctly stated and is more availing. He says that his convictions for both drug conspiracy under 21 U.S.C. § 846, and for participating in a continuing criminal enterprise under 21 U.S.C. § 848, violate the Double Jeopardy Clause of the Fifth Amendment because the § 846 conspiracy charge is a lesser included offense of the § 848 CCE charge. The government concedes this is the case, as indeed it must in light of our holding to just this effect in *United States v. Atencio*, 435 F.3d 1222, 1235 (10th Cir. 2006) (citing *Rutledge v. United States*, 517 U.S. 292, 300 (1996)). Necessarily, then, we remand this matter to the district court with instructions to vacate Mr. Hutchinson's conviction on either the drug conspiracy charge or the CCE charge.

III

From Mr. Hutchinson we turn to Mr. Thompson. Mr. Thompson first contends that the district court erred by denying his motion to suppress certain evidence seized from his house during his arrest. Second, he argues that the

district court abused its discretion in denying his motion for substitution of counsel. Third, he submits that the district court erred in refusing to grant his severance motion. Fourth and finally, he claims that his trial counsel was ineffective. We find none of these challenges persuasive. Yet, as with Mr. Hutchinson, Mr. Thompson's convictions for CCE and conspiracy cannot both stand, and so we remand Mr. Thompson's case to the district court to vacate one of them.

A

In assessing Mr. Thompson's appeal from the district court's denial of his suppression motion, we review *de novo* the legal question whether the arresting officers' conduct comported with the Fourth Amendment, but in doing so we accept the district court's factual findings unless clearly erroneous and must view the evidence in the light most favorable to the prevailing party in the district court—here, the government. *See United States v. Cheromiah*, 455 F.3d 1216, 1220 (10th Cir. 2006).

Before us, Mr. Thompson contends that the officers who arrested him in his home had no business entering the dwelling. Because they did so anyway, he says, the evidence the officers found in his clothing at the time of the arrest (drugs and a gun) should have been suppressed by the district court. We cannot agree. The officers in this case had a valid warrant for Mr. Thompson's arrest.

Heeding the common law maxim that a "man's house is his castle," in *Payton v. New York* the Supreme Court has held that law enforcement officers may enter a home to execute an arrest warrant only when the officers have a reasonable belief that (1) the arrestee lives in the residence and (2) the arrestee is in the residence at the time of entry. 445 U.S. 573, 596-97, 602-03 (1980); *Valdez v. McPheters*, 172 F.3d 1220, 1225 (10th Cir. 1999). The district court rightly acknowledged this standard and correctly held that both of these requirements were met in this case.

First, the officers had a reasonable belief that Mr. Thompson lived in the house in question. After several lower-level associates at the Alpine Rose were arrested, a former Alpine Rose resident and associate of Mr. Thompson's, Lori Chavez, told police officers she knew where Mr. Thompson was living. Ms. Chavez then accompanied officers to a neighborhood in suburban Denver and pointed to the house where, she said, Mr. Thompson lived. Uniformed officers approached the front door and knocked. A fifteen-year-old girl answered and, when asked if Mr. Thompson lived in the house, she confirmed that he did, adding that he happened at the moment to be just down the hall in his bedroom. Previously, we have held that an officer can reasonably rely on an informant who personally accompanies the officer to the arrestee's residence, points at it, and affirms that the arrestee resides there. *United States v. Gay*, 240 F.3d 1222, 1227

(10th Cir. 2001).  Here, we have all that and more, with the person answering the door confirming the informant's account.

Second, officers also had reason to believe Mr. Thompson was in the house at the time of the arrest.  In *Gay*, we found that officers could reasonably believe that the target of an arrest warrant was at the home after an informant, in a face-to-face encounter, told the officers the suspect was home and accompanied the officers to the house.  *Id.* at 1227-28.  Here, again, we have more.  The person who answered the door not only acknowledged that Mr. Thompson was in the house, she told the officers the precise room in which Mr. Thompson could then be found.  Mr. Thompson contends that the officers should not have credited this assertion because the person who answered the door was a teenager.  A maligned lot though teenagers sometimes are, we have no precedent indicating that they are categorically unreliable when answering the door, and we are given no reason to think a fifteen-year old's statement at the door that a person is at home and in a particular room is, by dint only of the utterer's age, inherently fantastical.

Because Mr. Thompson has only challenged the officers' authority to enter the home, and not the officers' subsequent search of his clothing once they entered the home, our analysis of his motion to suppress necessarily ends here; having correctly found both *Payton* factors present, the district court was right to deny the motion.

B

Mr. Thompson next challenges the district court's denial of his pre-trial

motion to substitute counsel, as well as his later renewal of that motion. To

warrant a substitution of counsel, a defendant must present the district court with

"good cause, such as a conflict of interest, a complete breakdown of

communication or an irreconcilable conflict which leads to an apparently unjust

verdict." *United States v. Beers*, 189 F.3d 1297, 1302 (10th Cir. 1999); *see also*

*United States v. Lott* (*Lott II*), 433 F.3d 718, 725 (10th Cir. 2006). Mr. Thompson

argued to the district court and now argues to us that he can meet this standard

because, in his case, there was a complete breakdown in communication between

himself and his attorney.

Our review of the district court's disposition of motions for substitution is

confined to asking whether the court abused its discretion. *Lott II*, 433 F.3d at

725. By definition, questions committed to a district court's discretion call on

the district court to exercise some degree of judgment and "render a decision

based upon what is fair in the circumstances and guided by the rules and

principles of law." *Shook v. Bd. of County Comm'rs*, 543 F.3d 597, 603 (10th

Cir. 2008) (citation and alteration omitted). Such decisions often involve

consideration of "incommensurate and disparate considerations," *United States v.*

*McComb*, 519 F.3d 1049, 1053 (10th Cir. 2007), so "there will not necessarily be

a single right answer, but a range of possible outcomes the facts and law at issue can fairly support," *Big Sky Network Canada, Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1186 (10th Cir. 2008). In light of the fact that there may be more than one reasonable resolution to a matter committed to the district court's discretion, appellate judges do not simply substitute our judgment for the district judge's but ask instead whether the district court's chosen course qualifies as one of those "rationally available choices given the facts and the applicable law in the case at hand." *Shook*, 543 F.3d at 603. It is only when the district court's decision is legally erroneous, or when the facts are so lopsided against the option the district court has chosen (even when abiding the rule a district court's factual findings may be reversed only when clearly erroneous), that we reverse. *See McComb*, 519 F.3d at 1054 ("[W]e will not hesitate to [reverse] where a decision is either based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment.") (citations and quotation marks omitted); *see also id.* at 1054 n.4.

We see in this case no such abuse of the discretionary judgment entrusted to the district court. The district court responded to Mr. Thompson's initial motion by holding an *ex parte* hearing, a sometimes helpful if not always necessary step, and one that certainly suggests a degree of care. *Cf. United States v. Lott* (*Lott I*), 310 F.3d 1231, 1249 & n.15 (10th Cir. 2002). The sparse

evidence developed at that hearing and later proceedings and ultimately provided in the record on appeal to us can be rationally read as supporting the view that, while Mr. Thompson and his counsel disagreed about strategy, they were still capable of communicating. Indeed, Mr. Thompson's first motion itself attests to several ongoing visits with his attorney. Under our binding case law, "strategic disagreement[s]," while no doubt unhelpful to a productive working relationship, are "not sufficient to show a complete breakdown in communication." *Lott II*, 433 F.3d at 725 (quoting *Lott I*, 310 F.3d at 1249). Rather, "to prove a total breakdown in communication," under our precedent, "a defendant must put forth evidence of a severe and pervasive conflict with his attorney or evidence that he had such minimal contact with the attorney that meaningful communication was not possible." *Lott I*, 310 F.3d at 1249. And it is of course the defendant's burden to meet this high standard. Without any evidence precluding the possibility of mere strategic disagreement or suggesting such a "total breakdown in communication," we cannot say the district court abused its discretion in denying Mr. Thompson's motions.

C

Mr. Thompson argues that the district court also erred when it denied his motion for severance. In that motion, Mr. Thompson asked (1) to be tried without any codefendants on his RICO charge pursuant to Federal Rule of Criminal

- 25 -

Procedure 14 because he would be prejudiced by a joint trial; and (2) to receive a separate trial, pursuant to Federal Rule of Criminal Procedure 8(a), for counts arising from conduct after he left the Alpine Rose. The district court denied both requests and held a trial in which Mr. Thompson was tried alongside Mr. Gladney and Mr. Montoya. Before us, Mr. Thompson renews his two arguments for severance.

We address first Mr. Thompson's Rule 14 claim. To win such a motion in the district court, Mr. Thompson was obliged to show, among other things, that the denial of severance would result in "actual prejudice" to his defense, *United States v. Eads*, 191 F.3d 1206, 1209 (10th Cir. 1999), and that this prejudice would "outweigh" the expense and inconvenience of separate trials, *United States v. Martin*, 18 F.3d 1515, 1518 (10th Cir. 1994). The district court's ultimate decision taking into account such disparate and incommensurable concerns is reviewed on appeal for the sort of abuse of discretion we have previously described. *See* Part III.B, *supra*; *United States v. Olsen*, 519 F.3d 1096, 1102-03 (10th Cir. 2008).

Such an abuse Mr. Thompson cannot show. He suggests that, because he was alleged to be the leader of the racketeering organization, the jury might have improperly held the alleged bad acts of his subordinates against him. He places special emphasis on the fact that Mr. Gladney was accused of murdering Marlo

Johnson, and argues that the jury might have convicted Mr. Thompson because it believed he was responsible for the acts of his "underling." But the jury acquitted Mr. Thompson of one charge of distribution in this case, dispelling the notion that it was inclined to convict Mr. Thompson based solely on his associations rather than on the evidence. As to the counts on which Mr. Thompson was convicted, moreover, the evidence was overwhelming, again casting doubt on any suggestion that the jury improperly imputed Mr. Gladney's murder to him. *See United States v. Hardwell*, 80 F.3d 1471, 1487 (10th Cir. 1996) (reasoning that strong evidence against one codefendant negated the claim that he was convicted only because of guilt-by-association).

Even if we assume (without granting) that the joint trial created a significant risk of prejudice, the Supreme Court has recognized that, like the decision to sever itself, "tailoring of the relief to be granted, if any, [is left] to the district court's sound discretion." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). Furthermore, limiting instructions are "ordinarily sufficient to cure potential prejudice." *Hardwell*, 80 F.3d at 1487. The jury instructions in this case did just that. Mr. Thompson's jury was specifically instructed which defendants were charged with which predicate act of the racketeering charges against them. Jurors were further instructed that the murder was a predicate racketeering act only for Mr. Gladney. They then were instructed that, while Mr.

Gladney was charged with seven racketeering acts, Mr. Thompson was charged with four. And then the court reminded the jury that

> [y]ou must consider whether the Government has proven the guilt of each defendant independently with regard to the specific charges brought against that defendant. You will return a separate verdict on the charges against each defendant. You must consider the evidence separately as to each charge against each defendant. Your verdict as to one defendant should not influence your verdict as to any other.

T. Vol. XXIII at 1220-21.

That these considered and considerable instructions were sufficient to cure prejudice (if any there was) is confirmed by the fact that they are analogous to—and probably stronger than—those the Supreme Court found sufficient in *Zafiro*. In *Zafiro*, two defendants with mutually antagonistic defenses sought severance arguing, among other things, that the jury would believe one defense and reject the other and thus find at least one of them guilty without regard to whether the government proved its case beyond a reasonable doubt. 506 U.S. at 540. The Supreme Court held severance was not required because the following instruction cured any possibility of prejudice: "[G]ive separate consideration to each individual defendant and to each separate charge against him. Each defendant is entitled to have his or her case determined from his or her own conduct and from evidence [that] may be applicable to him or her." *Zafiro*, 506 U.S. at 541 (alteration in original). We cannot see any basis for thinking Mr. Thompson was under any greater risk of prejudice than the defendants in *Zafiro*;

- 28 -

if the instructions in that case were sufficient to cure any possibility of prejudice, the same, ineluctably, must hold true of the even more detailed instructions offered here.

This leaves us with Mr. Thompson's Rule 8 argument that he should have received a separate trial for offenses arising after he left the Alpine Rose because they bore no relationship to the crimes he committed while at the motel. Unlike the largely discretionary Rule 14 question whether to sever or join defendants, the question whether to sever or join criminal counts turns on the purely legal question whether the charged offenses are of the "same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8. Accordingly our review here is *de novo*, *see United States v. Johnson*, 130 F.3d 1420, 1427 (10th Cir. 1997), though we are mindful to "construe Rule 8 broadly to allow liberal joinder to enhance the efficiency of the judicial system," *id.*

Our review of the offenses charged yields the same conclusion as the district court's did. The charges concerning Mr. Thompson after he left the Alpine Rose alleged that his drug business trotted along much as it had before. He still supplied drugs for the operation. Mr. Hutchinson still served as the primary dealer. Other dealers remained largely the same. Mr. Thompson even bailed some of the Alpine Rose participants out of jail. Only the operation's

central headquarters seems to have changed.  In light of all this, we can see no basis for disagreeing with the district court's legal conclusion that the offenses before and after the Alpine Rose were, in Rule 8's vernacular, "connected with or constituted parts of a common scheme or plan."

D

Finally, as it did with respect to Mr. Hutchinson, *see supra* Part II.B, the government has conceded that a double jeopardy problem lurks in Mr. Thompson's case because he was convicted both for drug conspiracy under 21 U.S.C. § 846 and for participating in a continuing criminal enterprise under 21 U.S.C. § 848.  Answer Br. at 4 n.2.  As we did in Mr. Hutchinson's case, we remand the matter to the district court with instructions to vacate either Mr. Thompson's conviction on the drug conspiracy charge or the CCE charge.[3]

IV

---

[3]  Mr. Thompson also argues before us that his trial counsel was ineffective.  In *United States v. Galloway*, however, we stated that ineffective assistance claims brought on direct appeal are "presumptively dismissible, and virtually all will be dismissed."  56 F.3d 1239, 1240 (10th Cir. 1995) (en banc).  While *Galloway* recognized that there may be the "rare instance[]" in which an ineffectiveness claim "may need no further development prior to review on direct appeal," *id.*, this is not such a case.  Mr. Thompson's ineffectiveness claim depends upon his assertion that he did not consent to the strategy his counsel pursued – a fact we are not well equipped to determine without the type of evidentiary record that can be developed on collateral review.

At the conclusion of his retrial, Mr. Montoya was convicted and sentenced for two counts of possession with intent to distribute crack cocaine in violation of 21 U.S.C. § 841 and one count of conspiracy to distribute drugs in violation of 21 U.S.C. § 846. Mr. Montoya's complaints about his retrial boil down to this: it should never have happened; it should have happened sooner; or at the very least it should not have included Mr. Thompson and Mr. Gladney. Mr. Montoya also brings several challenges to his sentencing. We are, however, unable to agree that any of these various arguments warrants reversal.

A

Mr. Montoya contends that the Double Jeopardy Clause barred his retrial for conspiracy after the jury was unable to reach a verdict in his initial trial. Mr. Montoya recognizes that a hung jury "is not an event which terminates jeopardy." *Richardson v. United States*, 468 U.S. 317, 325 (1984); *cf. United States v. Farr*, 536 F.3d 1174, 1186-87 (10th Cir. 2008). Still, Mr. Montoya suggests, double jeopardy concerns are specially implicated in his case because he had a pending motion for acquittal based on the prosecutor's alleged misconduct during closing argument. Thus, his argument appears to be that, but for the hung jury, the district court would have had to grant his motion for acquittal.

Whatever else one might say about this argument, its final premise is surely flawed. Even if the prosecutorial misconduct he alleges might have

compelled the district court to grant a motion for mistrial, double jeopardy still would not have prevented his retrial unless the government *intended to provoke* a mistrial through its misconduct. *Oregon v. Kennedy*, 456 U.S. 667 (1982). "Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, . . . does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." *Id.* at 675-76. Yet, Mr. Montoya in no way suggests that the prosecutor's allegedly improper remarks in his case were "intended to 'goad' [him] into moving for a mistrial," *id.* at 676, or otherwise secure a mistrial. To the contrary, Mr. Montoya argues, and from our review of the record we agree, the prosecutor uttered the challenged remarks in a fit of zeal aimed at securing a conviction, not a do-over. Without even an allegation (to say nothing of evidence) that the prosecutor intended to provoke a mistrial, Mr. Montoya cannot establish a double jeopardy bar to his retrial based on prosecutorial misconduct.

B

Mr. Montoya next argues that his retrial was untimely under the Speedy Trial Act. We review the district court's compliance with the Act's legal requirements *de novo*. *United States v. Apperson*, 441 F.3d 1162, 1177 (10th Cir. 2006). Those requirements provide, among other things, that when a defendant is

to be retried following a mistrial, the new trial "shall commence within seventy days from the date the action occasioning the retrial becomes final." 18 U.S.C. § 3161(e). Mr. Montoya disputes whether this requirement was satisfied in his case.

It was. Mr. Montoya emphasizes that his trial took place more than 70 days after the jury in his first case hung and the court declared a mistrial. But the statute's plain language does not guarantee a new trial within 70 days of a mistrial being declared. Instead, it provides for a new trial within 70 days "from the date the action occasioning the retrial becomes final." Mr. Montoya urges that the declaration of a mistrial normally constitutes the final action occasioning a retrial, pointing to our decision in *United States v. Doran*, 882 F.2d 1511, 1514 (10th Cir. 1989), where the parties and court proceeded on such an assumption, albeit without contesting the issue. *Cf. Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (holding that, when a court assumes a legal conclusion without squarely addressing the question, its assumption bears no *stare decisis* effect). Even if that assumption is sometimes correct, however, it is not always and inevitably so. As our sister circuits have recognized, when a pending appeal may preclude the necessity of a retrial, it must be resolved before the statutory clock can start ticking. *See, e.g.*, *United States v. Kington*, 875 F.2d 1091, 1109 (5th Cir. 1989). Of course, there was no appeal in this case. But at the time of the mistrial

declaration, the court did have under advisement a motion filed by Mr. Montoya seeking a mistrial on the drug distribution counts for which the jury returned guilty verdicts. In a supplemental brief in support of that motion, Mr. Montoya argued that a retrial on any count, including the conspiracy count on which the jury hung, would violate double jeopardy. Because the district court had Mr. Montoya's motion for a mistrial on the distribution counts under advisement at the time of the mistrial declaration, and because he sought in that motion to preclude the government from retrying him for conspiracy, the mistrial declaration in this case was hardly, in the words of the Act, the final action "occasioning the retrial." Until the district court ruled on Mr. Montoya's double jeopardy argument against any retrial, it was not clear whether a retrial was necessary. So even though Mr. Montoya's motion was ultimately rejected, until it *was* rejected the necessity of any retrial had not "become[] final." *Cf. United States v. Rivera*, 844 F.2d 916, 919 (2d Cir. 1988) (finding time required to resolve a double jeopardy motion filed after a mistrial declaration to be excludable delay).

Having said this much, the question still remains whether the qualifying final action came when the district court denied the motion for a mistrial and found no double jeopardy problem with retrial, or when it entered an order setting the new trial. But this we need not resolve. Either way, Mr. Montoya's retrial

- 34 -

took place in a timely fashion. Working from the earliest possible date, the day the district court disposed of Mr. Montoya's motion for acquittal, the 70 day clock began ticking on October 11, 2006. One day elapsed until Mr. Montoya filed a motion to extend his time for an interlocutory appeal on October 12, 2006. M. Vol. III doc. 935. After a seven-day period of excludable delay, *see* 18 U.S.C. 3161(h)(1)(H), the district court granted the motion on October 19, 2006. M. Vol. III doc. 943. Thirty-four days then elapsed until November 22, 2006, when the first of several pretrial motions was filed, triggering the excludable delay provisions of 18 U.S.C. § 3161(h)(1)(D). *See* M. Vol. III doc. 967 (government's motion to reset the trial); *see also id.* doc. 970 (Nov. 27, 2006) (Mr. Montoya's motion to dismiss conspiracy charge under the Speedy Trial Act); *id.* doc. 990 (Dec. 11, 2006) (Mr. Montoya's motion for severance from codefendants); *id.* doc. 1067 (Jan. 5, 2007) (Mr. Montoya's second motion to dismiss under the Speedy Trial Act). The district court resolved all of these motions in a single order on January 11, 2007. *Id.* doc. 1081. As of that date, then, thirty-five nonexcludable days had elapsed since October 11, and another thirty-five days remained on the clock. Barring any further excludable delay, Mr. Montoya's trial therefore had to begin on or before February 15, 2007. The retrial began on February 7, with eight days to spare.

- 35 -

C

Even if his second trial was timely, Mr. Montoya argues that the district court should not have retried him with Mr. Thompson and Mr. Gladney. Here, Mr. Montoya claims that the district court should have severed his trial under Federal Rule of Criminal Procedure 14 because of the risk from trial alongside defendants who faced more serious charges. We apply the same abuse of discretion standard of review to Mr. Montoya's challenge as we did to Mr. Thompson's Rule 14 severance argument, *see* Part III.C, *supra*, and, in doing so, find no such abuse.

Before the district court, Mr. Montoya asserted that trying him alongside Mr. Thompson and Mr. Gladney, men charged with more serious crimes, created a risk that the jury might convict him merely because of his association with them—and that this risk "outweighed" the burdens associated with holding an additional trial. At first, the district court seemed to agree, granting Mr. Montoya a separate trial. But after the jury at Mr. Montoya's trial hung, the district court decided to rejoin his case with Mr. Thompson's and Mr. Gladney's rather than hold yet another Alpine Rose trial. In doing so, the district court cited the burden of holding another—fifth, in all—trial in this matter and noted that "[t]he sole remaining charge against Mr. Montoya, the conspiracy charge in Count 3, [was] the same as that asserted against Mr. Thompson and Mr. Gladney." M. Vol. III at

1081.  Thus, as the district court now viewed the case, it was "one where an allegedly low-level member of a conspiracy is to be tried on a single conspiracy count along with allegedly high-level members of the same conspiracy who are also charged with [other offenses]." *Id.*  The district court acknowledged that evidence against Mr. Thompson and Mr. Gladney had the potential to "spill over into a jury's determination of the conspiracy charge against Mr. Montoya," but the court thought the difference in culpability between Mr. Montoya and his codefendants might actually benefit Mr. Montoya by reinforcing his argument that he was just an "errand boy," not a conspirator.  *Id.* at 13 & n.9.  The court added that it believed the effect of any such prejudice could be addressed through appropriate jury instructions.  *Id.* at 13 & n.10.  After weighing any potential prejudice against the expense and inconvenience of another separate trial for Mr. Montoya, the district court concluded severance was not essential.

In this appeal, Mr. Montoya argues that the district court was right the first time and was, *a fortiori*, wrong the second time.  But this argument misconceives the nature of abuse of discretion review.  As we emphasized in explaining the abuse of discretion standard in Part III.B, *supra*, when a question is committed to the district court's discretion, it is possible that there is no single right answer that the district court must reach to be affirmed.  Rather, as the Seventh Circuit has explained, when a matter is entrusted to the district court's discretion:

[I]t is possible for two judges, confronted with the identical record, to come to opposite conclusions and *for the appellate court to affirm both*. That possibility is implicit in the concept of a discretionary judgment. If the judge could decide only one way he would not be able lawfully to exercise discretion; either he would be following a rule, or the circumstances would be so one-sided that deciding the other way would be an abuse of discretion. If the judge can decide either way because he is within the zone in which he has discretion . . . this implies that two judges faced with the identical record could come to opposite conclusions yet both be affirmed.

*United States v. Williams*, 81 F.3d 1434, 1437 (7th Cir. 1996) (emphasis in original) (citation omitted). We must therefore resist Mr. Montoya's invitation to weigh the relative merits of the district court's two conflicting judgments on severance; instead, we may consider only whether the decision before us, to permit rejoinder, was a "rationally available choice[] given the facts and the applicable law in the case at hand." *Big Sky Network Canada*, 533 F.3d at 1186.

We believe it was. It is true that Mr. Montoya's alleged culpability was far less than that of his codefendants, and that much of the RICO evidence against Mr. Thompson and Mr. Gladney would not otherwise have been admissible at his trial. And it is true that the Supreme Court in *Zafiro* recognized that evidence admissible only against some codefendants can create the risk of an unfair trial for the other codefendants, particularly in complex cases where defendants have markedly different degrees of culpability. 506 U.S. at 539. But it is also true that *Zafiro* recognized such prejudice usually can be cured by limiting instructions to the jury. *Id.* And here, again, the district court offered extensive limiting

- 38 -

instructions that, if anything, exceeded those employed and approved in *Zafiro*.
*See* Part III.C, *supra* (recounting instructions). We, too, have previously found
instructions analogous to those employed by the district court sufficient in cases,
much like Mr. Montoya's, involving multiple defendants with significantly more
and less criminal exposure. *See, e.g.*, *United States v. Thompson*, 518 F.3d 832,
862-63 (10th Cir. 2008); *Hardwell*, 80 F.3d at 1487; *United States v. Emmons*, 24
F.3d 1210, 1219 (10th Cir. 1994). Seeing no credible way to distinguish *Zafiro* or
our own precedents, we cannot help but conclude that the limiting instructions
cured any possibility of prejudice and thus that the court acted within its
discretion in denying Mr. Montoya's motion for severance.

D

Mr. Montoya raises several challenges to his sentence. We review
sentences imposed by the district court for "reasonableness." *See Gall v. United
States*, 552 U.S. 38 (2007); *Rita v. United States*, 551 U.S. 338 (2007); *United
States v. Todd*, 515 F.3d 1128, 1134 (10th Cir. 2008). Our review "includes both
a procedural component, encompassing the method by which a sentence was
calculated, as well as a substantive component, which relates to the length of the
resulting sentence." *United States v. Smart*, 518 F.3d 800, 803 (10th Cir. 2008).
All of Mr. Montoya's challenges involve alleged procedural defects in his

sentence. Ultimately, we agree with one of Mr. Montoya's sentencing challenges, return the second to the district court for its consideration, and reject the rest.

First, Mr. Montoya argues that the district court erred when it concluded that it was bound by a twenty-year statutory minimum on his § 841 convictions for possession with intent to distribute. We agree with Mr. Montoya that this was error. While the government did file an information pursuant to 21 U.S.C. § 851(a) to establish Mr. Montoya's prior felony drug conviction, and while his prior conviction increased the applicable statutory *maximum* sentence, *see* 21 U.S.C. §841(b)(1)(C), his possession with intent to distribute convictions carry no statutory minimum, *id*. The district court's conclusion that a twenty-year statutory minimum applied to these convictions was therefore wrong. Neither can we say confidently that this error was harmless: the district court seemed to indicate that it would have imposed a much lower sentence on the possession with intent to distribute convictions but for the fact that it believed it was bound by a statutory minimum sentencing requirement. Accordingly, we reverse Mr. Montoya's sentence on his two possession with intent to distribute counts and remand with instructions for the district court to reconsider his sentence.

Second, Mr. Montoya argues that the district court committed further procedural error on his § 841 convictions when it refused to deviate from the Sentencing Guidelines' treatment of cocaine base relative to cocaine powder. The

district court ruled that under then-operative Tenth Circuit law, it was "restricted to the calculation in the guidelines and [was] not free to impose its own view of what proportionality should be applied to correlations between cocaine powder and cocaine base." *Id.* at 21. After the district court's ruling, however, the Supreme Court held in *Kimbrough v. United States*, 552 U.S. 85 (2007), that a district court is not bound by the Guidelines' crack/powder distinctions when they produce a sentence that is "greater than necessary" to achieve the purposes set out in 18 U.S.C. § 3553(a), *id.* at 564. So while the district court was correct to say that it could not consider Mr. Montoya's argument under our then-governing precedents, *Kimbrough* has since freed it to do so. Of course, the district court is under no obligation to adopt Mr. Montoya's argument, but it must entertain it if his sentence is to qualify as procedurally reasonable today. We also note that, in calculating the advisory Guidelines sentence for Mr. Montoya's § 841 convictions, the district court should use the now-operative version of § 2D1.1 of the Sentencing Guidelines. *See United States v. Regalado*, 518 F.3d 143, 150-51 (2d Cir. 2008) (directing district court to consider amended Sentencing Guidelines when resentencing defendant on remand).

Third and finally, Mr. Montoya claims he was entitled to a two-level acceptance-of-responsibility reduction in the calculation of his advisory Guidelines sentence on the two § 841 counts. *See* U.S.S.G. § 3E1.1(a). Mr.

Montoya claims his acceptance of responsibility was established when his lawyer, in his opening statement at Mr. Montoya's first trial, admitted his client's guilt with respect to the possession counts with which he was charged and ultimately convicted. The district judge refused to award the two-level sentencing reduction, explaining that this was not an actual acceptance of responsibility but rather a "strategic decision by the defense" aimed to preserve a chance of acquittal. M. Vol. XXXIV at 21.

We review a district court's determination not to allow a reduction for acceptance of responsibility for clear error, *United States v. McAlpine*, 32 F.3d 484, 489 (10th Cir. 1994), and discern none here. We have held that "[w]hen a defendant is convicted at trial, a sentencing court's determination that he has accepted responsibility is based primarily on *pre-trial* statements and conduct." *United States v. Eaton*, 260 F.3d 1232, 1237 (10th Cir. 2001) (emphasis added); *see also* U.S.S.G. § 3E1.1 cmt. 2 ("This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial . . . ."). In *Eaton*, the district court refused to award the defendant an acceptance-of-responsibility reduction even though the defendant had testified to his factual guilt at trial. We affirmed, explaining that the defendant's mid-trial *mea culpa* was insufficient to establish the reduction and that there were no pretrial statements or conduct by the defendant to support the acceptance of responsibility

determination. *Eaton*, 260 F.3d at 1237. This case is no different: the only basis Mr. Montoya offers for the reduction is his attorney's statement at trial, and we have held that an admission of guilt at trial does not suffice.[4]

V

Mr. Gladney challenges his RICO and drug conspiracy convictions, arguing that there was insufficient evidence for the jury to convict him on either score. In reviewing sufficiency challenges, we ask whether, viewing the evidence in the light most favorable to the government as the prevailing party, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Rakes*, 510 F.3d 1280, 1284 (10th Cir. 2007). In so doing, we do not weigh evidence or credibility; we ask instead only whether the

---

[4] Mr. Montoya raises two additional challenges to his sentence that do not require significant discussion. Though he acknowledges that the Supreme Court's decision in *Almendarez-Torres v. United States*, 523 U.S. 224 (1998), permits the fact of a prior conviction to be established by information instead of by proof to a jury, *id.* at 226-27, he notes "for the record" his objection to this practice in the event the Supreme Court someday overrules *Almendarez-Torres*. Additionally, he claims that 21 U.S.C. § 851(a), the statute that allows the prosecutor to establish a prior conviction by information, violates the constitutional doctrine prohibiting the delegation of legislative power because it does not prescribe an "intelligible principle" for the executive to follow in deciding whether to seek a sentencing enhancement on this basis. But allowing prosecutors discretion to seek (or not seek) sentencing enhancements involves no delegation of *legislative* power: such a decision is an exercise of the prerogative power committed to the *executive* department, *see Greenlaw v. United States*, 128 S. Ct. 2559, 2565 (2008); *United States v. Nixon*, 418 U.S. 683, 693 (1974), and is no different than the discretion possessed by prosecutors to bring (or not bring) criminal charges in the first instance.

government's evidence, credited as true, suffices to establish the elements of the crime. *Id.* While this standard of review is deferential, it is not decrepit. We will not, for example, uphold a conviction "obtained by piling inference upon inference, and the evidence supporting a conviction must do more than raise a mere suspicion of guilt." *Id.*

## A

Mr. Gladney's first sufficiency challenge is to his RICO conviction. Before us, Mr. Gladney argues that the evidence at his trial showed he and others were merely independent operators who just happened all to live and sell drugs at the Alpine Rose. He disputes the existence of evidence sufficient to show either (1) that there was a bona fide "enterprise" at the Alpine Rose, or (2) that he participated in that "enterprise." There was, however, ample evidence of both.

We have already outlined what is required to show a group has sufficient structure to warrant RICO's "enterprise" appellation – purpose, interpersonal relationships, and longevity. *See* Part II.A, *supra*. As the facts we recited at the outset of our opinion, *see* Part I, *supra*, illustrate, each of these elements was alive and well at the Alpine Rose. Without repeating all those facts here, it suffices to recall that the participants in the drug trade at the Alpine Rose did not view each other as competitors but instead worked together to sell drugs and make money; that they worked toward this common aim by each performing their

designated job responsibilities at the direction of Mr. Thompson and Mr. Hutchinson; that the residents also worked together to avoid police detection through the use of numerous surveillance devices; that the residents often gathered together for meetings where they discussed aspects of the drug-dealing business and for celebrations on special occasions; and that all of this lasted sufficiently long for the Alpine Rose to become so well-known as a crack market that over 100 customers stopped there daily to buy drugs. From this alone, it is obvious that the motel's residents joined together with the common purpose of collectively selling drugs and making money, that the residents developed many interpersonal relationships integral to carrying out this goal, and that this persisted for enough time for the participants to engage in a pattern of racketeering activity. After *Boyle*, this is more than enough to qualify as an enterprise.

There was likewise ample proof from which the jury could conclude that Mr. Gladney participated in the enterprise. In *Reves v. Ernst & Young*, 507 U.S. 170 (1993)*,* the Supreme Court held that, to establish that the defendant "conduct[ed] or participate[d], directly or indirectly, in the conduct of such enterprise's affairs," as § 1962(c) requires, the government must show that he or she "participated in the operation or management of the enterprise." *Id.* at 179. This language, read in isolation, could plausibly be understood to narrow the class

of individuals who can be convicted under § 1962(c) to the bosses of the enterprise.  Yet, the Supreme Court has explained that, to participate in the operation or management of an enterprise, the defendant must only have "*some part in directing the enterprise's affairs.*" *Id.* at 179 (emphasis in original).  The Court has stressed, too, that "[a]n enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management." *Id.* at 184.

As with many other of RICO's requirements, various of our sister circuits have, arguably at least, come to slightly different conclusions on how best to read *Reves*.  In *United States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994), for example, the First Circuit suggested that individuals inside an enterprise who "knowingly implement[] decisions" made by upper management may be held liable.  *See also United States v. Fowler*, 535 F.3d 408, 419 (6th Cir. 2008); *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 978 (7th Cir. 1995); *United States v. Starrett*, 55 F.3d 1525, 1548 (11th Cir. 1995).  The Second Circuit, meanwhile, has suggested that more may be required, holding that a defendant did not "conduct or participate . . . in the conduct" of an enterprise's affairs even though he transported stolen goods at the direction of the enterprise's kingpin.  *United States v. Viola*, 35 F.3d 37, 41-43 (2d Cir. 1994), *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52 (1997).  As the Second Circuit

later explained its test, while a defendant need not "act[] in a managerial role" to conduct or participate in the conduct of an enterprise, he or she must at least "exercise[] broad discretion in carrying out the instructions of his principal." *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999) (internal quotation marks omitted).

Happily, we have no need today to weigh into the debate over what it takes to "participate" in the conduct of an enterprise. Even under the strictest formulation apparently available, the Second Circuit's requirement that the defendant both carries out the decisions of the enterprise bosses and has "broad discretion when doing so," there was sufficient evidence for the jury to find that Mr. Gladney participated in the conduct of the Alpine Rose enterprise.

A jury could rationally conclude, for example, that Mr. Gladney was working under the direction of Mr. Thompson and Mr. Hutchinson, in part because it seems utterly doubtful that Mr. Thompson and Mr. Hutchinson would have allowed Mr. Gladney to stay at the Alpine Rose if he was working independently. As noted in Part I, *supra*, Mr. Thompson and Mr. Hutchinson regularly ordered residents out of the Alpine Rose if they did not want them around. Rival drug dealers especially were not tolerated and they were often violently attacked. Yet, despite a policy against competitors that would make even the most brazen monopolist blush, Mr. Thompson and Mr. Hutchinson

allowed Mr. Gladney to live at the motel and sell drugs out of his room. Had Mr. Gladney not been working for the enterprise under the direction of Mr. Thompson and Mr. Hutchinson, it seems highly unlikely that they would have tolerated Mr. Gladney's presence as a rival supplier. A more plausible explanation for Mr. Gladney's presence at the motel is that he was directed by Mr. Thompson and Mr. Hutchinson to sell drugs at the motel and afford the enterprise an alternative source of supply. Indeed, it would make sense for Mr. Thompson and Mr. Hutchinson to accept an alternative supplier in the operation so that the enterprise would not lose business on those occasions when it would otherwise be unable to meet demand. And, in fact, the dealers at the Alpine Rose treated Mr. Gladney in just this way, turning to him for drugs when Mr. Thompson's supply ran out. Further connecting Mr. Gladney to Mr. Thompson and the rest of the enterprise is the fact that many runners who worked for Mr. Thompson also ran drugs for Mr. Gladney. And then there is the episode involving the Alpine Rose customer who testified that he was cheated on a drug order by Mr. Montoya. The customer complained to Mr. Thompson who rebuked Mr. Montoya and gave the customer double the drugs to compensate. The customer testified that, in the future, he bought drugs from Mr. Gladney and Mr. Gladney provided a double order as well. Given the abundant evidence demonstrating Mr. Thompson's role as the leader of the drug business at the Alpine Rose, a rational jury could have found that Mr.

Gladney provided that double order because he was carrying out Mr. Thompson's wish to make amends for a bad customer service experience.

There is also sufficient evidence for a jury to find that Mr. Gladney exercised "broad discretion" in his role as backup supplier to the enterprise. The fact that Mr. Gladney received drugs from someone other than Mr. Thompson itself establishes a certain degree of discretionary authority. The evidence also shows that Mr. Gladney exercised considerable managerial power in his drug sales at the Alpine Rose. Several people who worked with Mr. Gladney to distribute drugs considered him their "boss." G. Vol. V at 805. He told his employees what to do, and when one of those employees, Yvette DeHerrera, did not perform as Mr. Gladney wanted her to, Mr. Gladney did what middle managers often do: he fired her. *Id.* at 802. All of this shows that Mr. Gladney was no low-level employee without discretionary authority, but a significant player in the Alpine Rose who, though he served under Mr. Thompson and Mr. Hutchinson, was given significant latitude in how he did his job.

B

Mr. Gladney also appeals his conviction for conspiracy to distribute more than 50 grams of crack cocaine under 21 U.S.C. § 846 and 21 U.S.C. §§ 841(a)(1) and (b)(1)(A). To prove that Mr. Gladney was guilty of conspiracy, the government had to show that (1) two or more persons agreed to distribute cocaine,

(2) Mr. Gladney knew the essential objectives of the agreement, (3) he knowingly and voluntarily became a part of it, and (4) the alleged coconspirators were interdependent. *United States v. Carnagie*, 533 F.3d 1231, 1238 (10th Cir. 2008). Mr. Gladney's challenge to this conviction mirrors his challenge to the RICO charge: he contends that the evidence at trial shows, at most, that he was an independent drug dealer who happened to use the Alpine Rose as his base of operations, and that there is no evidence (1) he became a part of the conspiracy or (2) the alleged coconspirators were interdependent. Again, we are unable to agree.

Turning first to the question whether there is evidence that he joined the conspiracy, Mr. Gladney points out that the government must prove that he had a "unity of purpose or a common design and understanding" with the other coconspirators to distribute cocaine. *See United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir. 1990). But we have recognized that "[b]ecause a criminal conspiracy by its very nature is usually shrouded in a further conspiracy of silence, the common plan or purpose must often be, and may legitimately be, proved by circumstantial evidence." *United States v. Robertson*, 45 F.3d 1423, 1442 (10th Cir. 1995). And there was a great deal of circumstantial evidence in this case suggesting that Mr. Gladney shared with Mr. Thompson and Mr. Hutchinson a common plan and purpose to distribute drugs. This evidence

included the facts that Mr. Gladney resided and sold drugs at a motel where the other alleged coconspirators also lived and sold drugs; that Mr. Thompson and Mr. Hutchinson would not tolerate anyone unaffiliated with them to remain at the motel, yet they did not try to drive out Mr. Gladney; that Mr. Gladney was good friends with Mr. Hutchinson and served as a source to dealers who also purchased from Mr. Thompson and Mr. Hutchinson; that runners who worked for Mr. Thompson and Mr. Hutchinson also worked for Mr. Gladney; and that Mr. Gladney ostensibly followed Mr. Thompson's lead in overcompensating a customer after he was shortchanged by Mr. Montoya. Such evidence was more than sufficient for the jury to find that Mr. Gladney joined the Alpine Rose conspiracy. *See id.* (finding sufficient evidence that the defendant joined drug conspiracy because he was associated with coconspirators; sold drugs at the organization locations; was present at organization houses; exchanged money with coconspirator; and provided drugs to coconspirator).

There was also sufficient evidence for the jury to find interdependency between the coconspirators. "Interdependence requires that a defendant's actions facilitate the endeavors of other alleged coconspirators or facilitate the venture as a whole." *Carnagie*, 533 F.3d at 1238 (internal quotation marks omitted). Testimony at trial suggested, among other things, that Mr. Gladney supplied the dealers of the Alpine Rose with drugs when Mr. Thompson or Mr. Hutchinson ran

out. Even without resort to ample other proof, this evidence alone shows that Mr. Gladney facilitated the actions of the venture as a whole.

Mr. Gladney argues that the government has not shown that the other dealers at the motel depended on him to achieve their goal. *See United States v. Yehling*, 456 F.3d 1236, 1241 (10th Cir. 2006) (explaining that interdependence is present when each coconspirator depends on the actions of other coconspirators to achieve the common goal). Mr. Gladney complains that he only supplied a small portion of the total drugs sold at the Alpine Rose and that, as a result, the entire operation could not have depended on his contribution. We do not draw the same conclusion. Even if the evidence showed that Mr. Gladney supplied a (relatively) modest amount of cocaine, the Alpine Rose was meeting the demands of over 100 customers each day, and there were times when demand outstripped Mr. Thompson and Mr. Hutchinson's supply. The jury could have reasonably concluded that, if Mr. Gladney was not available to fill orders when the other dealers ran dry, customers would have to be turned away. And if this happened too many times, the Alpine Rose might lose its reputation as a "drive-thru" market where crack was available on demand. On this view of the evidence, a view compelled by our standard of review, Mr. Gladney was plainly integral to the success of the operation, and interdependence was shown.

* * *

At the end of this long road, a map sketching where we have traveled may prove helpful to the parties and district court. We affirm Mr. Hutchinson's (Case No. 07-1204) conviction for violating § 1962(c), but reverse his convictions for conspiracy and CCE with instructions for the district court to vacate one of the convictions in accordance with Part II.B, *supra*. We also reverse Mr. Thompson's (Case No. 07-1230) convictions for conspiracy and CCE with the same instructions, but otherwise affirm Mr. Thompson's convictions. We affirm Mr. Montoya's (Case No. 07-1234) convictions along with his sentence on the conspiracy count, but reverse his sentences for both counts of drug possession with the intent to distribute, and remand with instructions for the district court to reconsider his sentence in light of Part IV.D. Finally, we affirm Mr. Gladney's (Case No. 07-1264) convictions.

*So ordered.*
