**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Roger B. EMMONS, Defendant–Appellant.**

No. 93–3244.

United States Court of Appeals, Tenth Circuit.

May 13, 1994.

---

Daniel E. Monnat of Monnat & Spurrier, Chartered, Wichita, KS, for defendant-appellant.

David Lind, Asst. U.S. Atty. (Randall K. Rathbun, U.S. Atty. and Kim M. Fowler, Asst. U.S. Atty., on the brief), Wichita, KS, for plaintiff-appellee.

Before BALDOCK, Circuit Judge and McWILLIAMS, Senior Circuit Judge and SHADUR, Senior District Judge.*

SHADUR, Senior District Judge.

After a jury trial, Kansas farmer Roger Emmons ("Roger") was found guilty of each of the four drug-related counts in a superseding indictment: one count charging a conspiracy to manufacture marijuana (21 U.S.C. § 846), another asserting possession with intent to distribute marijuana plants (21 U.S.C. § 841(a)(1)) and the other two charging him with maintaining a place for the purpose of manufacturing marijuana plants (21 U.S.C. § 856). One of Roger's two codefendants, Jack Rivard ("Rivard"), entered a guilty plea before trial, while the other codefendant, Roger's brother Daryl Emmons ("Daryl"), went to trial jointly with Roger.[1] Roger raises four issues on this appeal, charging the district court with errors in:

1. denying Roger's motion to suppress evidence obtained in executing a search warrant;

2. admitting an item of evidence that Roger characterizes as hearsay;

3. upholding the jury verdict even though the evidence against Roger was assertedly insufficient to sustain his conviction; and

4. denying Roger's motion for severance rather than a joint trial with Daryl.

We reject each of Roger's arguments and affirm his conviction.

### Facts

In April 1992 informant Lynette Hines ("Hines") told Wichita Police detectives Bruce Watts ("Watts") and John Stinson ("Stinson") that "Jack Rivard was possibly involved in the growing of marijuana and possibly growing it at a house in Wichita." After Rivard denied the detectives' request to search his home, he moved to Greenwood County, Kansas, where he took up residence on property owned by Roger.[2]

Some time during the following month, Watts and Stinson passed Hines' tip along to Special Agent Rickey Atteberry ("Atteberry") of the Kansas Bureau of Investigation ("KBI"). Atteberry decided to visit Rivard's property along with Watts, Stinson and Hines. There they saw over 100 marijuana plants, the majority of which were protectively enclosed within wire screens.[3]

---

* The Honorable Milton I. Shadur, Senior United States District Judge for the Northern District of Illinois, sitting by designation.

1. Daryl was also found guilty of each of the two counts in which he was named: the conspiracy count and the possession-with-intent-to-distribute count. Daryl's conviction is not before us for review.

2. Both (1) to avoid any unfavorable inferences merely because one alleged coconspirator occupied property owned by another and (2) because occupancy rather than mere ownership is potentially relevant to someone's knowledge of mari-

juana plants growing on a property, we will refer to the property just mentioned in the text as "Rivard's property." In the same way, properties mentioned later as occupied by Roger and Daryl will be referred to respectively as "Roger's property" and "Daryl's property."

3. Though the plants were not actually on Rivard's property—they were located a quarter mile north on adjoining property belonging to Francis Heller—Atteberry testified that the adjoining parcel had in fact previously belonged to Rivard himself dating back to 1990 and that a question existed as to whether it was owned by Rivard or Heller at the time in question.

Agent Atteberry decided to expand his investigation to include Roger's activities for several reasons. For one thing, Hines also said that she had known Rivard for some seven years and that he and his friend Roger had been growing marijuana together, then selling the plants for $1,500 each to a man she later identified as Daryl. According to Hines, Rivard and Roger split the profits 50–50: They made $40,000 each in 1990 and $11,000 each in 1991. In addition, Rivard's subpoenaed telephone records "identified Roger Emmons as a person he [Rivard] regularly contacted by telephone." Those items linked up with information previously obtained from Robert Burnett ("Burnett")[4] that Daryl had hired him to install a breaker box and wire Roger's property to permit the operation of 220 submersible pumps, which Burnett testified at trial were to be used for the subterranean irrigation of marijuana fields. Burnett also testified that while he was working on that project he ran into Roger on occasion and that during one such encounter Roger had told him (to the best of Burnett's recollection) that Roger and Daryl "were going to grow marijuana out there."

On July 8, 1992 Atteberry and a number of other agents (acting pursuant to a search warrant) entered onto the property where Roger lived ("Roger's property," owned by Daryl—see n. 2). Leading from the garage and trailer home into the woods, the agents observed "very distinctive trails" alongside which they found clusters of up to 30 marijuana plants. All told, the team counted more than 150 well-cared-for plants, with the surrounding dirt having been hoed and with some of the smaller stalks being sheltered by rodent screens similar to those on Rivard's property.

Next day the agents returned to the Rivard property to set up surveillance cameras in an effort to find out who was cultivating the marijuana. But as the agents approached the area they saw Rivard and Roger in the process of watering the illicit crop. Both men were then immediately placed under arrest.[5]

After having been read their *Miranda* rights, both Rivard and Roger made statements that were later testified to at trial. Rivard told the officers, "You got us now. I have never done this before." Then while an agent was getting biographical information from Roger, Rivard said to Roger, "We are really screwed this time," to which Roger replied "Yeah, that's what you get for trying to make an extra buck."

After the arrests, a helicopter aerial search of the Rivard property revealed the location of two additional marijuana clusters containing a total of 205 plants. When agents then returned to Roger's property to tell his wife that he had been arrested "so she wouldn't be worried about him," they saw more trails that led them to more marijuana fields behind Roger's residence—this time comprising a total of 530 plants. All of the plants referred to in this paragraph had been tended and wire-screened like the others.

Later that night (July 9) KBI Special Agent Ray Lundin ("Lundin") submitted an application to a Greenwood County judge for a search warrant for Roger's residence and garage. In the space calling for the particular description of the objects of the search, Lundin referred to his attached sworn affidavit, as did the warrant promptly issued by the judge. Upon executing the warrant the agents located and seized a hand-drawn map found in Roger's kitchen, which Atteberry testified at trial corresponded to the configuration of the marijuana patches, along with various items in the garage consistent with the cultivation of marijuana (though also useable for legitimate purposes): watering buckets, wire screening, an unopened 12–pound bag of Miracle Gro brand plant food and quantities of lime (a chemical used to treat the ground when growing marijuana).

*Motion To Suppress*

Before trial Roger moved to suppress all physical evidence, statements and observations derived through the execution of the last-mentioned search warrant. That motion was denied after a pretrial hearing. Before us Roger contends (1) that Lundin's underly-

---

4. Burnett had previously gone by the name of Darren Hiner.

5. That same day the agents also conducted a "walk-in" onto Daryl's property, where they seized 14 more marijuana plants.

ing affidavit was insufficient to provide probable cause for the issuance of a warrant to search Roger's residence and (2) that the warrant was overbroad because it failed to state with particularity the things to be seized.

■ For the purpose of our review, we must accept the trial court's findings of fact unless clearly erroneous and must view the evidence in the light most favorable to the government (*United States v. Dahlman*, 13 F.3d 1391, 1394 (10th Cir.1993)). Whether or not a violation of the Fourth Amendment has occurred, however, is a question of law to be considered de novo (*id.*).

### 1. *Probable Cause*

For over a decade the older "two-pronged" inquiry into probable cause has been replaced by a less rigid totality-of-the circumstances approach. *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983) has summarized that newer approach in these terms:

> The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the "veracity" and "basis of knowledge" of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis for ... conclud[ing]" that probable cause existed.

■ Roger's initial position, that there was no evidence to support the belief that he was a marijuana distributor, is wholly unpersuasive. For starters, the judge who issued the warrant was certainly entitled to consider the large quantity of marijuana discovered during the two expeditions onto Roger's property, an amount totally at odds with purely personal consumption. And Lundin's affidavit also referred to his personal observation of Roger and Rivard watering similar marijuana plants on Rivard's property (where agents had seen between 150 and 200 marijuana plants alongside paths leading up to the house and outbuildings, situated in such a

way as to be concealed from aerial surveillance). Like the district judge, we will not disturb the legitimate determination by the state court judge that substantial evidence supported the issuance of the warrant (*Massachusetts v. Upton*, 466 U.S. 727, 728, 104 S.Ct. 2085, 2085–86, 80 L.Ed.2d 721 (1984) (per curiam)).

■ Roger is equally unpersuasive in arguing that even if the marijuana could give rise to an inference of distribution, it could not fairly be inferred that evidence would be found *in his home*. Quite to the contrary, once the entirely reasonable determination was made that Roger was involved in the possession of marijuana with intent to distribute it, the state court judge could properly credit Lundin's affidavit (which we quote verbatim):

> Based upon the training and experience the affiant believes probable cause exists that numerous items of evidence in the investigation of possession of marijuana with intent to sell and other violations are present in the residence, out buildings and vehicles of Roger Emmons in Fall River, Kansas.
>
> That distributors of controlled substance keep records including but not limited to of sales, payments, purchases, money orders, customers names, and address, photo's and other recordings.
>
> That distributors of controlled substance keep packaging supplies, scales and other drug paraphernalia as well as firearms and radio scanners.
>
> That cultivators of marijuana keep hoses, fertilizer, insecticide, and other items used to grow marijuana.
>
> That distributors of controlled substances keep liquid assets often in the form of U.S. currency or other items of value which are proceeds from their drug transactions.
>
> That these items described above are often concealed in the residence, vehicles, outbuildings or on the grounds of the distributors residence.
>
> \*    \*    \*    \*    \*    \*
>
> Therefore the affiant believes probable cause exists that proceeds, from the sale of marijuana in the form of U.S. currency and other items of value, firearms, radio scan-

ners, marijuana and items used the cultivation of Marijuana, and other evidence of the manufacture or possession of illegal drugs are present in the residence, outbuildings and vehicles located on property currently occupied by Roger Emmons. The Affiant prays the Court to issue a search warrant for the property described on the search warrant.

## 2. *Particularity and Overbreadth*

■ Under the Fourth Amendment every warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized"—a requirement that prevents a "general, exploratory rummaging in a person's belongings" (*Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971)). Roger criticizes what he describes as the "boilerplate paragraphs" in Lundin's affidavit. But we have recently reaffirmed in *United States v. Wicks,* 995 F.2d 964, 973 (10th Cir.1993) (quoting *United States v. Harris,* 903 F.2d 770, 775 (10th Cir.1990)) that "a warrant describing 'items to be seized in broad and generic terms may be valid if the description is as specific as circumstances and nature of the activity under investigation permit.'" For as *Wicks, id.* at 974 quotes from *United States v. Riley,* 906 F.2d 841, 845 (2nd Cir. 1990), allowing drug agents some latitude in this area "simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'"

■ Roger thus loses in his attack on the affidavit's level of particularity. We turn to his second line of attack: the claimed overbreadth of the affidavit. On that score we can do no better than to repeat our language in validating a comparable set of warrants in *Harris,* 903 F.2d at 775 (citations omitted):

> This court finds that the warrants, although worded in very broad and general terms, do not violate the fourth amendment. "When the circumstances of the crime make an exact description of the fruits and instrumentalities a virtual impossibility, the searching officer can only

be expected to describe the generic class of items he is seeking." The type of criminal activity under investigation in the present case—a drug dealing business—makes it difficult to list with any greater particularity the books and records desired to be seized which evidences such activity. Thus, we agree with the district court that the warrants described the items to be seized as specifically as possible under the circumstances.

*Accord, Wicks,* 995 F.2d at 973 ("We have upheld search warrants cast in comparably broad terms, where the subject of the search was a drug trafficking or drug dealing business, and where circumstances permitted only a more general listing of the items to be seized").[6]

### *Admissibility of the Hand-drawn Map*

■ Roger next urges that the district court erred in admitting into evidence the hand-drawn sketch seized from Roger's kitchen during the July 9 search of his residence. That one-page drawing marks out 13 different locations identified by letters, each with a number as well. There was also a key in the corner of the map, showing a star as the symbol for "lime" (there were six locations so marked on the map itself) and a "+" as the symbol for urea (shown on one location).

■ Evidentiary rulings are generally committed to the discretion of the trial judge and are reviewed only for an abuse of that discretion (*United States v. McIntyre,* 997 F.2d 687, 698 (10th Cir.1993), citing *United States v. Zimmerman,* 943 F.2d 1204, 1211 (10th Cir.1991)). And such deference to the trial judge is heightened when (as here) we review rulings as to the admissibility of what is claimed to be hearsay evidence (*id.,* citing *Boren v. Sable,* 887 F.2d 1032, 1033 (10th Cir.1989)).

Roger contends that the alleged map should have been excluded as inadmissible

---

**6.** We should not leave this first aspect of the case without observing that even if we had taken a more favorable view of Roger's arguments to this point, his motion to suppress would still fail because of the good faith exception to the exclusionary rule as defined in *United States v. Leon,* 468 U.S. 897, 922–24, 104 S.Ct. 3405, 3420–21, 82 L.Ed.2d 677 (1984). We have purposefully declined to skip straight to the good faith exception as a basis for affirmance, rather than following the line we have taken. Such a course would have been contrary to *Leon,* which warned of the dangers of "freezing" Fourth Amendment jurisprudence (see *Dahlman,* 13 F.3d at 1397–98).

hearsay. But the evidence was not offered "to prove the truth of the matter asserted" (Fed.R.Evid. 801(c))—that marijuana was indeed growing on Roger's property. After all, the agents had found the drugs on the property, so there was no need to rely on the map to establish that. Instead the map was plainly admissible for the non-hearsay purpose of demonstrating that Roger had *knowledge* of the location and quantity of the marijuana plants and of the efforts to treat the ground for their cultivation (see *United States v. Nall*, 949 F.2d 301, 309 (10th Cir. 1991); *Hernandez v. United States*, 608 F.2d 1361, 1364 (10th Cir.1979)). Roger has not shown that the trial court's decision was an abuse of discretion.

■ Roger also objects to the claimed absence of any authentication of the map and to Atteberry's "testimonial speculation" as to the meaning of its markings. As to the first of those issues, Atteberry's familiarity with the layout of Roger's property—based on the agent's personal observation—was surely enough to liken it to the map, thus showing "that the matter in question is what its proponent claims" (Fed.R.Evid. 901(a)). And as for the second, it was plainly permissible for the agent to liken the map's marked locations and numbers to the location and numbers of marijuana plants on the property (thus posing a factual question for the jury to evaluate). Once again there is no basis to find an abuse of discretion as required by *McIntyre*, 997 F.2d at 698.

■ But as with Roger's first contention, he would fail even if we had taken a different view of the admissibility question—for Roger still could not overcome the "nonconstitutional standard of harmless error" of Fed. R.Crim.P. 52(a) (*McIntyre*, 997 F.2d at 705– 06). In light of the discussion in the following section, we hold that there was ample evidence to convict Roger with or without the introduction of the map (*id.* at 706).

### Sufficiency of the Evidence

■ Roger's third contention is that the evidence presented against him was insufficient to support his conviction on the various counts. Any such argument must surmount an extraordinarily high hurdle. To begin with, we must view all of the evidence, as well as all of the reasonable inference that may drawn from it, in the light most favorable to the government (*United States v. Riggins*, 15 F.3d 992, 994 (10th Cir.1994). And we are called on to determine "whether *any* rational trier of fact could have found the essential elements of the crime, after viewing the evidence in the light most favorable to the prosecution, beyond a reasonable doubt" (*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original)).

■ Although Roger challenges the evidence as to all of the counts, we focus first on the conspiracy count because the evidence that we will summarize in that respect also bears on each of the other charges. Here are the necessary elements of a conspiracy conviction (*United States v. Evans*, 970 F.2d 663, 668 (10th Cir.1992), quoting *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir.1990)):

> "[1] that two or more persons agreed to violate the law, [2] that the defendant knew at least the essential objectives of the conspiracy, ... [3] that the defendant knowingly and voluntarily became a part of it," and [4] that the alleged coconspirators were interdependent.

And here is a brief recapitulation of the trial evidence in the light most favorable to the government:

● Burnett testified that while he was working to wire Roger's garage for marijuana irrigation pumps he ran into Roger, who made a comment to the effect that Roger and brother Daryl "were going to grow marijuana out there."

● Drug agents initially discovered on Roger's property between 150 and 200 marijuana plants, growing in such a way as to indicate they had been cultivated: All the ground around them had been hoed and treated with chemicals, and smaller sprouts were covered by protective screens similar to those found on Rivard's property.

- Trails connected the marijuana patches to Roger's home, and a hand-drawn map was found in his kitchen. Atteberry testified that the map diagramed the layout of the property and corresponded roughly to the marijuana patches.[7]
- Roger (together with Rivard) was observed by drug agents watering marijuana plants.
- After having been arrested at that point, Roger said, "This is what you get when you try to make an extra buck. At that same time, Rivard twice used "us" and "we" in the course of his self-inculpatory statements (plainly referring to Roger as well as to himself).
- Agents later seized 530 additional marijuana plants growing on Roger's property, as well as chemicals that were commonly associated with the growing of marijuana—including buckets similar to the one in Roger's possession when he was arrested.
- Telephone logs revealed numerous telephone calls between Rivard's and Roger's residences.

Although Roger tries to portray as irrational any inferences from that evidence that support his conspiracy conviction, his position really boils down to asking us to discredit evidence that the jury was plainly entitled to credit. Each of the elements of a criminal conspiracy was amply supported. And the same is true of the elements of each of the other counts with which Roger was charged.

### Severance

██ Finally, Roger renews before us the motions that he made both before and during the trial that he would be prejudiced by being forced to go to trial with Daryl. As his appellate brief puts it, "the spillover effect from the disproportionate evidence" applicable to Daryl alone impinged on Roger's right to a fair trial. Roger contends that the evidence against him was "minimal," so that he was convicted on the basis of a guilt-by-association "birds of a feather" theory.

Just this past Term, the Supreme Court has prescribed in *Zafiro v. United States,* —— U.S. ——, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993) the lens through which questions of severance are to be viewed. And we have

since then re-summarized those operative principles in *United States v. Youngpeter,* 986 F.2d 349, 353 (10th Cir.1993) (citations other than *Zafiro* omitted):

> Separate trials are not a matter of right where two or more defendants allegedly participated in the same act or transaction or the same series of acts or transactions that constituted a criminal offense. A severance should be granted by the district court "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* —— U.S. ——, 113 S.Ct. 933 [122 L.Ed.2d 317] (1993). In order to obtain a separate trial, the defendant must make a strong showing of prejudice. This burden is heavy for the defendant to bear as he must show more than a better chance of acquittal or a hypothesis of prejudice, he must, in fact, show real prejudice. Any potential prejudice suffered by Mr. Youngpeter must be weighed " 'against the important considerations of economy and expedition in judicial administration' ..., considerations [that] are quite strong when the codefendants allegedly conspired with each other." As a severance is a matter of discretion and not right, we review the trial court's decision denying a severance under an abuse of discretion standard.

██ It makes no difference that the government's case against Daryl may perhaps have been stronger than against Roger (*United States v. Hack,* 782 F.2d 862, 871 (10th Cir.1986)). Nor does it matter that Roger might perhaps have been less likely to have been convicted absent Daryl's presence at his trial (*Zafiro,* —— U.S. at ——, 113 S.Ct. at 938 says "it is well settled that the defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials")). As we put it in *Youngpeter,* 986 F.2d at 353:

> The mere fact that one co-defendant is less culpable than the remaining co-defendants is not alone sufficient grounds to establish

---

**7.** As indicated in the preceding section, elimination of the map from the evidence would still have left ample evidence to support Roger's conviction on all counts.

a trial court abused its discretion in denying a severance. It would be normal and usual to assume one of two or more codefendants would be more or less culpable than the others. The joint trial did not "compromise a specific trial right" of Mr. Youngpeter and did not "prevent the jury from making a reliable judgment [as to Mr. Youngpeter's] guilt or innocence." *Zafiro*, —— U.S. ——, 113 S.Ct. 933, 112 L.Ed.2d 317. Mr. Youngpeter failed to meet his burden of showing real prejudice, and the trial court did not abuse its discretion in denying Mr. Youngpeter's motion for severance.

Finally, any spillover or guilt-by-association argument is scotched not only by the in-trial admonitions issued by the district court judge that certain evidence against Daryl was to be considered for that purpose only (see *United States v. DeLuna*, 10 F.3d 1529, 1532 (10th Cir.1993)) but also by the final jury instructions on the conspiracy charge that "the evidence should be considered separately as to each individual defendant" (Instr. 16) and that "In determining whether or not a defendant was a member of a conspiracy, you are not to consider what others may have said or done, but membership in such a conspiracy must be established as to that defendant by the evidence in the case as to his own conduct, what he himself willfully said or did" (Instr. 17).[8] *Zafiro*, —— U.S. at ——, 113 S.Ct. at 938–39 (as well as our own Circuit's case law) teaches that juries may properly be relied on to differentiate among defendants and among charges.

Roger has candidly acknowledged that he could not find a single Tenth Circuit case reversing a trial court for denying a motion for severance. This is surely not the occasion to depart from that pattern.

### Conclusion

None of the issues raised by Roger's appeal has proved persuasive. His conviction on all counts, and his resulting sentence, are affirmed.

---

8. As for the other counts, it will be remembered that Daryl was not named in the final two counts, which were asserted only against Roger. And the possession-with-intent-to distribute count was far more than amply supported against Roger, as we have already said.