**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 12, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

PATRICK WAYNE MCHENRY, a/k/a
Savage,

    Defendant - Appellant.

No. 24-7048

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:21-CR-00326-RAW-2)**

_____

Shira Kieval, Assistant Federal Public Defender (Virginia L. Grady, Federal Public
Defender, with her on the briefs), Office of the Federal Public Defender for the District of
Colorado, Denver, Colorado, for Defendant-Appellant.

Luke Rizzo Cascio, Assistant United States Attorney (Christopher J. Wilson, United
States Attorney, with him on the brief), Office of the United States Attorney for the
Eastern District of Oklahoma, Muskogee, Oklahoma for Plaintiff-Appellee.

_____

Before **McHUGH**, **EID**, and **FEDERICO**, Circuit Judges.

_____

**EID**, Circuit Judge.

_____

A jury found Patrick Wayne McHenry guilty of, among other crimes, violating 18 U.S.C. § 924(c)(1)(A) by carrying a firearm during and in relation to crimes of violence—namely, a robbery in Indian Country and a carjacking.[1]

McHenry now appeals his § 924(c)(1)(A) conviction, arguing the government presented insufficient evidence that he carried his shotgun *during* the predicate robbery offenses because he did not possess or move the shotgun during the "taking" stage of either offense.  We disagree.

Though McHenry may not have had a firearm on his person while committing the predicate robbery offenses, the evidence, viewed in the light most favorable to the government, suffices to show that McHenry was constructively "carr[ying]" the shotgun "during" the continuation of his robberies:  while he fled from the scene. Thus, the evidence sufficiently supports the jury's § 924(c)(1)(A) guilty verdict. Accordingly, we affirm.

## I.

### A.

On the evening of September 11, 2021, B.N. was in a room at a Motel 6 in Muskogee, Oklahoma, with a man she had recently met, C.J.  The two had spent the day together, drinking alcohol and smoking marijuana.

---

[1] Because "carjacking is a type of robbery," *Jones v. United States*, 526 U.S. 227, 235 (1999), we refer to carjacking and federal enclave robbery as "robberies."

2

Around ten in the evening, B.N. asked C.J. for a ride home. C.J. declined because he had been drinking. B.N. then contacted McHenry, whom she had known for a short time, asking for a ride home from the motel.

McHenry picked up B.N. from the motel in his silver Honda, but instead of driving her home, he took her to his nearby house. The two entered the house together. Shortly thereafter, McHenry's girlfriend, Ashton Clark, arrived, at which point McHenry attacked B.N. Clark joined in the assault.

At McHenry's direction, Clark stood over B.N. and held her at gunpoint with McHenry's shotgun. McHenry proceeded to bind and gag B.N. McHenry and Clark then searched B.N. for money and drugs. They failed to find anything.

B.N. told McHenry she had "left everything" at the Motel 6, so he turned his attention there. R. Vol. I at 585. McHenry forced B.N. into the trunk of his Honda, shut the trunk, and told Clark to follow him. McHenry then set off for the Motel 6 in his Honda, with his shotgun sitting on the back floorboard and B.N. in the trunk. Clark followed McHenry in a separate car.

Once at the Motel 6, McHenry opened the trunk and demanded B.N. tell him what room she had stayed in. McHenry told her that if she sent him to the wrong room, he would kill her. B.N. gave McHenry the correct room number.

McHenry left B.N. and his shotgun in the Honda and went with Clark to B.N.'s old room, where C.J. remained. McHenry knocked and stood outside of the view of the peephole. C.J. opened the door, thinking it was B.N., and McHenry pushed his way into the room.

3

Inside the room, McHenry threatened to kill C.J., telling C.J. he would "[b]low [his] head off" and "blow [his] dick off." *Id.* at 499. McHenry did not have his shotgun on him, but he pretended to have a gun. C.J. thought McHenry "might have had a firearm," and so he "didn't want to take a chance" with anything. *Id.* McHenry and Clark stripped C.J. naked, stole all of his things—including his suitcase, clothes, tools, and cell phone—and loaded them into the Honda. They also took the keys to C.J.'s Subaru. McHenry told C.J. that he would kill him if he "ever told the cops or reported [the] car stolen." *Id.* at 493. McHenry also read C.J.'s address on his driver's license and threatened to kill his family if he reported the Subaru stolen. With C.J.'s (forced) help, McHenry started up the Subaru.[2] McHenry then returned C.J. to the motel room, where McHenry instructed him to lay down in the bathroom and told him "not to get up until daylight." *Id*. at 496.

With C.J. out of the way, McHenry returned to the Subaru, at which point he "made [Clark] get in the Honda and drive it," *id.* at 584, telling her "to follow him," *id.* at 588. The two then left the Motel 6, with McHenry in C.J.'s Subaru and Clark following behind in McHenry's Honda—which still held McHenry's shotgun and which now also contained the stolen items. C.J. waited until daybreak to go to a nearby business and call the police.

---

[2] After B.N. had left earlier in the night, C.J. grew afraid that she might return to steal his Subaru, so he removed and hid two of its fuses. McHenry forced C.J. to come outside and reinstall the fuses.

During the drive away from the Motel 6, B.N. managed to open the Honda's trunk from the inside, forcing Clark to pull over to resecure the trunk. When she could not do so, she called McHenry. McHenry arrived, exited the Subaru, put B.N. in the back seat of the Honda, and got into the Honda himself. At this point, McHenry's shotgun sat on the front passenger floorboard of the Honda. McHenry drove the Honda away, along with B.N. and the shotgun; Clark switched over to the Subaru and followed. After driving for some time, McHenry called Clark and instructed her to pull over, at which point he took the keys to the Subaru and told Clark he would contact her in three hours. McHenry left the Subaru where it was, and again set off in the Honda with B.N. inside.

McHenry drove B.N. to a house in Braggs, Oklahoma, where he confined B.N. to a shed on the property. After over a day in the shed, B.N. escaped and had a neighbor call 911. Law enforcement recovered C.J.'s things from the Honda and the house near the shed.

The same day, McHenry and Clark were arrested at the Tulsa Inn and Suites. Law enforcement recovered the shotgun from a duffle bag in the hotel room and found C.J.'s Subaru parked outside.

**B.**

On May 24, 2022, a federal grand jury returned an indictment charging McHenry with five crimes: (1) conspiracy to commit kidnapping, in violation of 18 U.S.C. § 1201(c); (2) kidnapping, in violation of 18 U.S.C. §§ 2 and 1201(a)(l); (3) carjacking, in violation of 18 U.S.C. § 2119; (4) robbery in Indian Country, in

violation of 18 U.S.C. §§ 2, 2111, 1151, and 1152; and (5) using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 2 and 924(c)(l)(A)(i).

Counts 3 and 4—carjacking and robbery in Indian Country—were the "crime of violence" predicates for the § 924(c)(1)(A)(i) charge in Count 5. Both statutes criminalize "tak[ing]" property "from the person or presence of another" "by force and violence" or "by intimidation." 18 U.S.C. §§ 2111, 2119.

McHenry's case proceeded to trial. At the close of the government's evidence, he moved for a judgment of acquittal under Federal Rules of Criminal Procedure Rule 29. Particularly relevant here, McHenry argued that "nobody testified that there was a gun on [him] at all during the time at the Motel 6," only that there was a shotgun inside the Honda that Clark "drove off in." R. Vol. I at 823. Thus, McHenry argued, there was insufficient evidence that he used or carried a gun "during and in relation to" the robberies at the Motel 6. The government responded that the evidence "that the shotgun was in the Honda and specifically the defendant brought the shotgun to the Motel 6 when they completed their robbery" was sufficient to sustain a § 924(c)(1)(A) conviction. *Id.* at 825.

The district court denied McHenry's Rule 29 motion, and the defense did not present any additional evidence. The jury ultimately found McHenry guilty on all charges, including violating § 924(c)(1)(A). By special interrogatory, the jury indicated that it found McHenry guilty of carrying (but not using) a firearm during the robberies. The district court imposed the mandatory consecutive five-year

6

sentence required by the § 924(c)(1)(A) conviction, for a total sentence of thirty-five years' imprisonment. McHenry timely appealed.

## II.

On appeal, McHenry renews his trial argument that there was insufficient evidence for the jury to convict him under § 924(c)(1)(A) because he did not carry a firearm during the robberies.

"We review sufficiency of the evidence claims de novo." *CGC Holding Co. v. Hutchins*, 874 F.3d 1201, 1209 (10th Cir. 2020). In examining a sufficiency-of-the-evidence challenge, "we review the entire record in the light most favorable to the government to determine whether the evidence is such that a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Sapp*, 53 F.3d 1100, 1103 (10th Cir. 1995) (quotation marks omitted) (quoting *United States v. Dirden*, 38 F.3d 1131, 1142 (10th Cir. 1994)). We must affirm if "any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt." *United States v. Emmons*, 24 F.3d 1210, 1217 (10th Cir. 1994) (quotation marks omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

## III.

18 U.S.C. § 924(c)(1)(A) provides that "any person who, during and in relation to any crime of violence . . . for which the person may be prosecuted in a court of the United States, uses or carries a firearm . . . shall, in addition to the punishment provided for such crime of violence . . . be sentenced to a term of imprisonment of not less than 5 years." "To sustain a conviction under 18 U.S.C. § 924(c)(1), the

7

government must prove three elements: (1) the defendant committed the underlying crime; (2) the defendant 'used' or 'carried' a weapon; and (3) the use or carriage of the weapon was 'during and in relation to' the [underlying crime]." *United States v. Lampley*, 127 F.3d 1231, 1240 (10th Cir. 1997) (quoting *United States v. Richardson*, 86 F.3d 1537, 1548 (10th Cir. 1996)).

On appeal, McHenry does not contest that he committed the underlying crimes. Accordingly, the only question is whether there is sufficient evidence that he "carried" the shotgun "during" the robberies. We find that there is.

**A.**

Section 924(c)(1)'s "carries" prong contains "two elements: possession of the weapon through the exercise of dominion or control; and transportation or movement of the weapon." *United States v. Martinez*, 912 F.2d 419, 420 (10th Cir. 1990); *see also United States v. Durham*, 139 F.3d 1325, 1335 (10th Cir. 1998). "Carrying" does not only refer to carrying a weapon on one's person. In *Muscarello v. United States*, the Supreme Court held that a person "carries a firearm" under § 924(c)(1) when the "person [ ] knowingly possesses and conveys firearms in a vehicle, including in the locked glove compartment or trunk of a car, which the person accompanies." 524 U.S. 125, 126–27 (1998). There is thus no question that McHenry "carrie[d]" the shotgun in the Honda while he drove the Honda from his house to the motel with his shotgun sitting on the back floorboard.

Following from *Muscarello*, we have also held that a person "carries a firearm" within the meaning of § 924(c)(1) when the person indirectly—or

8

*constructively*—possesses and conveys a firearm in a vehicle through a subordinate who, at the person's orders, drives the vehicle.[3]  In *United States v. Lindsey*, we held that the defendant "carrie[d]" firearms when the defendant's subordinate, "who did whatever [the d]efendant told him to do," drove a U-Haul filled with firearms inside, and the defendant followed in a separate vehicle.  389 F.3d 1334, 1338–39 (10th Cir. 2004) (internal quotation marks omitted).  On the "possession" element of "carries," we held that "although [the defendant was] not in actual possession of the firearms," the defendant "maintained constructive possession of the firearms while [the subordinate] transported them in the U-Haul because he exercised dominion and control over [the subordinate] and the U-Haul."  *Id.* at 1339.  And on the "transports" element, we held that the defendant "transported the firearms in the U-Haul, even though he was not physically present inside the vehicle," because he "paid for the U-Haul, directed [the subordinate] to drive the U-Haul, and insisted the U-Haul travel in tandem with him at all times."  *Id.*  We further stressed that the defendant "undoubtedly went along with the U-Haul as he and his cohorts traveled."  *Id.* (internal quotation marks omitted).

This case is not meaningfully distinguishable from *Lindsey*.  Here, Clark testified that, as McHenry was getting into the Subaru to leave the Motel 6, McHenry "made [her] get in the Honda and drive it," and he "told [her] to follow him." R. Vol. I at 584, 588.  The two then drove away from the Motel 6 together.  All

---

[3] We note the jury was instructed on constructive possession.

along, Clark followed McHenry's orders and looked to him for guidance. For instance, during their drive away from the motel, Clark called McHenry as soon as B.N. managed to open the trunk and Clark was unable to close it. And later, when Clark had since switched cars and was driving the Subaru, she pulled over, left the Subaru, and then split away from McHenry when McHenry called her and instructed her to do so. On these facts, just like in *Lindsey*, a rational juror could conclude that McHenry "exercised dominion and control over [Clark] and the [Honda]" during the time McHenry drove the Subaru, and led Clark in the Honda. *Lindsey*, 389 F.3d at 1339.[4]

For these reasons, McHenry was "carr[ying]" the shotgun within the meaning of § 924(c)(1) both while he drove the Honda, himself, and while he drove the Subaru and Clark followed in the Honda at his direction. Because McHenry "carried" the shotgun, the question then becomes whether any of that carriage occurred "during" either of the robberies under § 924(c)(1).

## B.

"A firearm is carried 'during and in relation to' the underlying crime, when the 'defendant avails himself of the weapon and . . . the weapon plays an integral role in the underlying offense.'" *United States v. Shuler*, 181 F.3d 1188, 1190 (10th Cir.

---

[4] One difference between this case and *Lindsey* is that, where the defendant in *Lindsey* "paid for the U-Haul," McHenry did not own or pay for the Honda. Clark, however, testified that McHenry was loaned the Honda but "never returned it"—and was not going to return it—because McHenry accused Clark of having an affair with the Honda's true owner. R. Vol. I at 580–81.

1999) (ellipsis in original) (brackets omitted) (quoting *Lampley*, 127 F.3d at 1240). To show this, the government "must establish a nexus between the carriage of the firearm and the underlying offense." *Id.* The "evidence must support a finding that the defendant intended the weapon to be available for use during the crime of violence." *Id.* (brackets omitted) (quoting *Richardson*, 86 F.3d at 1548).

McHenry begins with the premise that a firearm is "'carrie[d]' 'during . . . a[] crime of violence'" only "if the gun is carried contemporaneously with the commission of at least some of the conduct that constitutes an element of the predicate offense." Reply Br. at 5 (alterations in original). Building from there, McHenry contends that, by only carrying the shotgun in his Honda to and from the motel, and not carrying it *into* the motel room or *while* acquiring C.J.'s Subaru, he did not carry the firearm "during" his robberies under § 924(c)(1). McHenry's argument homes in on the word "takes"—and the lack of the phrase "and carries away"—in the predicate robbery statutes. *See* 18 U.S.C. §§ 2111, 2119. McHenry says that each of his two predicate robbery offenses "starts and ends with a violent taking," and to have carried a firearm "during" those offenses under § 924(c)(1), he reasons, he must have "both possesse[d] and move[d] a gun while engaged in that violent taking." Aplt. Br. at 20–22.

We have already rejected McHenry's narrow "during" argument. In *United States v. Brown*, 400 F.3d 1242 (10th Cir. 2005), the government charged a defendant under § 924(c)(1) with carrying a firearm during and in relation to a drug trafficking

11

offense, specifically, "'manufacturing methamphetamine,' in violation of 21 U.S.C. § 841(a)(1)." *Id.* at 1247. The jury convicted, and we affirmed.

The evidence showed that the defendant had manufactured methamphetamine at a criminal partner's motor home and trailer. *Id.* We held that the defendant "carried" a firearm within the meaning of § 924(c)(1) because the firearm was in the front seat of another partner's van that the defendant had driven on the day of his arrest. *See id.* at 1247–48.

The defendant maintained that there was no evidence that he "carrie[d]" the firearm "during" manufacturing methamphetamine, "because he was not actually manufacturing methamphetamine in [the] van while he was 'carrying' the [firearm], and he was not actually 'carrying' the [firearm] in [the] motor home or trailer when he was manufacturing methamphetamine." *Id.* at 1249. The defendant argued that the term "manufacture" in the predicate statute "does not include mere possession of ingredients that might be used to manufacture the controlled substance," which is the most that the defendant did while driving the van and "carrying" the firearm inside. *Id.* In essence, the defendant's argument was that he would have already completed the elements of the predicate "manufactur[ing]" offense in one location before he would "carr[y]" the firearm in the van, and he would stop "carr[ying]" the firearm in the van before he would re-start and re-complete the elements of the predicate "manufactur[ing]" offense in the second location.

We rejected the defendant's argument and held there was sufficient evidence that he carried the firearm "during" the crime of manufacturing methamphetamine.

In so holding, we looked beyond the predicate crime's statutory text and elements and focused more broadly on the body of the predicate offense as a logical whole. We treated the defendant's underlying statutory crime as a "continuing offense," even though the underlying statute itself did not indicate as much. *Id.* at 1249–50. That statute, by its terms, made (and still makes) it a crime "to manufacture . . . a controlled substance," 21 U.S.C. § 841(a)(1), which most naturally is read to criminalize a single event in time—the manufacturing itself.[5] Put differently, driving around with ingredients that could be used to manufacture methamphetamine, but not actually "manufactur[ing]" methamphetamine, would not itself, as McHenry himself argues, constitute "the commission of at least some of the conduct that constitutes an element of the predicate [§ 841(a)(1)] offense." Reply Br. at 5.

Nevertheless, we viewed this statutory crime as a "continuing offense" for § 924(c)(1) "during" purposes, observing that the evidence established "not only that [the defendant] manufactured methamphetamine, but that [his] methamphetamine manufacture was a continuous and ongoing operation" for over two weeks. *Brown*, 400 F.3d at 1249–50. We held that the operative question for whether the § 924(c)(1)

---

[5] In relevant part, "manufacture" means

the production, preparation, propagation, compounding, or processing of a drug or other substance, either directly or indirectly or by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis, and includes any packaging or repackaging of such substance or labeling or relabeling of its container.

*Id.* § 802(15).

conviction could stand, therefore, was "not whether the evidence demonstrate[d] the [firearm] was directly connected to any particular drug transaction or point in the methamphetamine production process, but whether the firearm was sufficiently connected to the 'continuing offense' as a whole." *Id.*

Thus, we held that the carriage occurred "during" the "continuing offense." *Id.* at 1250. We explained that the evidence before the jury supported the inference that the defendant "'carried' the gun throughout the period alleged in the indictment in connection with his road trips out of state to obtain the [ingredients]" to manufacture methamphetamine. *Id.* That was so because the "trips occurred 'during' the ongoing and underlying crime; indeed, they were essential to the maintenance of [the defendant's] continuous methamphetamine manufacturing enterprise." *Id.*

The upshot of *Brown* is that when we assess whether the carriage of a firearm occurs "during" an underlying crime within the meaning of § 924(c)(1), the underlying crime does not necessarily end right when the final element of that crime is satisfied. Restated, carriage need not occur at the precise moment that the defendant completes the last statutory element of a predicate crime for the carriage to have occurred "during" that predicate crime under § 924(c)(1). In *Brown*, none of the defendant's driving around in the van with the ingredients itself constituted any part of the offense of "manufactur[ing]" methamphetamine under § 841(a)(1). Still, we held that the driving with a weapon could be considered as occurring "during" the predicate crime for purposes of § 924(c)(1).

Under *Brown*, if the facts and law show that a predicate crime "was ongoing and continuous," a § 924(c)(1) conviction may lie if carriage occurred "during" that "ongoing and underlying crime." 400 F.3d at 1249–50. As the Third Circuit similarly stated—in a predicate-crime robbery case no less—§ 924(c)(1) does not require "look[ing] only at the offense under [the predicate criminal statute] to determine whether [a defendant] carried the gun 'during' the crime," rather, it "requir[es] a common sense, temporal approach to the specific facts." *United States v. Williams*, 344 F.3d 365, 374 (3d Cir. 2003).

*Brown* therefore dooms McHenry's categorical "during" argument. Again, just as the *Brown* defendant did with the word "manufacture" in the predicate statute there, McHenry argues that the operative word "take[]" in the two predicate robbery statutes here, 18 U.S.C. §§ 2111, 2119, required him to have carried a firearm "during" a "tak[ing]" to fall within § 924(c)(1)'s ambit. But even spotting McHenry that, as a substantive matter of his underlying crimes, the robberies were "committed at the precise moment" of a forcible taking, Aplt. Br. at 20 (cleaned up), *Brown* indicates that we need not mechanically graft that narrow time frame onto § 924(c)(1)'s "during" inquiry. *See* 400 F.3d at 1249–50.

Finally, if there were any doubt, applying *Brown* to McHenry's robberies puts us in good company: "a number of courts have held that, in the context of § 924(c), a bank robbery does not necessarily end at the point along the time line at which all of the elements of the offense have been established." *United States v. Cecil*, 615 F.3d 678, 693 (6th Cir. 2010) (collecting cases). And cases where federal bank robbery

15

under § 2113(a) was the predicate crime for § 924(c)(1) liability are fully apt here. As the Supreme Court has recognized, that statute's text tracks that of the carjacking statute (§ 2119) and the robbery in Indian Country statute (§ 2111). *See Jones v. United States*, 526 U.S. 227, 235–36 & n.4 (1999). Those statutes all, in pertinent part, criminalize only "tak[ing]" property. *See* 18 U.S.C. §§ 2111, 2113(a), 2119. The federal bank robbery and robbery in Indian Country statutes also both served as models for the federal carjacking statute. *See Jones*, 526 U.S. at 235–36 & n.4.

**IV.**

Because McHenry's robberies are "continuing offenses" for § 924(c)(1)(A) "during" purposes, the final question is whether the offenses continued throughout McHenry's flight from the Motel 6. They did. Thus, the evidence, viewed in the light most favorable to the government, established that McHenry was "carr[ying]" the shotgun "during" the time he fled the scene of the robberies. This legally amounts to a § 924(c)(1)(A) violation.

Robbery is generally viewed as a continuing offense that continues throughout flight from the scene. We have held that "the uniform generic definition of robbery incorporates the continuing offense theory." *United States v. Garcia-Caraveo*, 586 F.3d 1230, 1236 (10th Cir. 2009). Representative of that theory, the Model Penal Code provides that "[a]n act shall be deemed 'in the course of committing a theft' if it occurs in an attempt to commit theft or *in flight after the attempt or commission*." Model Penal Code § 222.1(1) (A.L.I. 2024) (emphasis added).

To that point, in *United States v. Burton*, 121 F. App'x 318 (10th Cir. 2005) (unpublished), we affirmed a § 924(c)(1)(A) conviction for carrying a firearm "during" a federal bank robbery where the defendant "did not carry the weapon into the bank," because the defendant "possessed a gun while obviously fleeing the robbery," and "escape or flight is a phase of a robbery." *Id.* at 323. To be sure, *Burton* is a non-precedential decision. But *Burton*'s persuasiveness grows when we consider that at least the Third, Sixth, Seventh, and Eighth Circuits have adopted the same principle: that flight or escape from a bank robbery "is part of the robbery and occurs 'during' it" under "the language of 18 U.S.C. § 924(c)(1)(A)." *United States v. Reichow*, 416 F.3d 802, 805 (8th Cir. 2005) (citing *United States v. Pate*, 932 F.2d 736, 738 (8th Cir. 1991)); *accord Williams*, 344 F.3d at 375 (3d Cir.) ("[F]light may be considered a part of a bank robbery under § 924(c)."); *United States v. Andrews*, 442 F.3d 996, 1002 (7th Cir. 2006) ("Escape is considered part of a robbery and the use of a firearm during an escape is a violation of 18 U.S.C. § 924(c)."); *see also Cecil*, 615 F.3d at 693 (6th Cir.) (collecting bank robbery cases and "[a]pplying this principle" in the Hobbs Act robbery context). And for the reasons explained above, cases like these dealing with § 2113(a) federal bank robbery as a predicate crime apply with full force to the robbery in Indian Country and carjacking predicates at issue here.

The government's evidence sufficed to prove that McHenry was fleeing from the scene of his robberies in the stolen Subaru while also constructively carrying the shotgun in the Honda. At least for the first few moments that McHenry drove the

17

stolen Subaru away from the Motel 6, with C.J.'s other items in tow in the accompanying Honda, he was engaged in flight from the scene "during" the robberies. This follows directly from our decision in *Burton*. There, we held that the defendant was "*obviously* fleeing the robbery" when he "had the firearm on his person within inches of the robbery proceeds, within a few blocks of the robbery, and not less than a few minutes after he left the bank premises." 121 F. App'x at 323 (emphasis added). Based on the carriage during that flight, *Burton* held, "the jury could reasonably find [the defendant] carried a gun in violation of § 924(c)." *Id.* The early stages of McHenry driving away in the Subaru, with Clark and the loot-filled Honda following close behind, track dispositively closely—in terms of temporal and spatial proximity to the robbery scene and proceeds—to what we deemed "obvious[]" flight, and thus "during" the robbery, in *Burton*.

What's more, McHenry's conduct during the robberies was calculated to aid in his flight, further linking the underlying robberies to the flight. While robbing C.J., McHenry "told [C.J.] he was going to blow [C.J.'s] brains out and kill [him] if [he] ever told the cops or reported [his Subaru] stolen." R. Vol. I at 493. Then, right before leaving, McHenry "read [C.J.'s] address off to [C.J.] and said that [he] was going to kill [C.J.'s] family if [C.J.] reported [the Subaru] stolen." *Id.* at 494–95. McHenry also took C.J.'s phone, made C.J. lay down on the bathroom floor naked, and "told [C.J.] not to get up until daylight." *Id.* at 496. From the jury's perspective, these threats could conceivably have contributed to C.J. waiting until the next day to report the robberies. This is particularly so given that the jury learned that C.J. knew

18

he could have easily gone to the Motel 6's main office and used a phone to report the robberies at any time. Based on McHenry's threats, which certainly contemplated a future flight, and which may have enabled that flight, a rational jury could conclude that McHenry's "flight" from the scene was "during" his underlying robberies within the meaning of § 924(c)(1).

And—the final piece of this puzzle—during the time McHenry was fleeing the robberies in the Subaru, he was constructively "carr[ying]" the shotgun in the Honda. As discussed above, McHenry "exercised dominion and control over [Clark] and the [Honda]" by "direct[ing] [Clark] to drive the [Honda]" and "insist[ing] the [Honda] travel in tandem with him" as he left the motel. *Lindsey*, 389 F.3d at 1339.

Therefore, the evidence, when viewed in the light most favorable to the government, reflects at least *some* temporal overlap between McHenry's flight and his constructive carriage of the shotgun. Accordingly, there was sufficient evidence that McHenry "carried" a firearm "during" his "ongoing and underlying" robberies. *See Brown*, 400 F.3d at 1250. That is sufficient evidence to sustain McHenry's § 924(c)(1)(A) conviction.

## V.

Finally, we acknowledge that the government's appellate brief primarily defends the jury's verdict by arguing that McHenry's carriage of the firearm *to* the Motel 6—i.e., the time *before* the "tak[ings]"—was "during" the robberies. *See* Aple. Br. at 13–14 (arguing that "the robber[ies] began when [McHenry] . . . started driving to the Motel 6 with his shotgun within reach, and with his accomplice

19

following in tandem at his direction"). Still, our decision to affirm based on McHenry's *post*-taking carriage is well supported by a theory that the government put forth at trial.

We can affirm a criminal conviction based on any theory presented to the jury. *See Chiarella v. United States*, 445 U.S. 222, 236 (1980). Here, the government has consistently—from trial, to briefing, to oral arguments—advanced a "post-taking" carriage theory along with the "pre-taking" theory.

At trial, the government argued to the jury that McHenry transporting the shotgun away from the Motel 6 to "the house in Braggs, and then back up to Tulsa," showed that he violated § 924(c)(1)(A). R. Vol. I at 894. It even argued that McHenry "simply retrieving [the gun] from the Honda" away from the Motel 6 was "carr[ying] the [gun] during and in relation to [the] carjacking and robbery." *Id.* at 895. And, at oral argument on appeal, the government clarified that it "has never abandoned the . . . theory that the robbery is still continuing while they escape" and that carriage during that escape—i.e., post-"tak[ing]"—suffices to affirm. Oral Arg. Audio at 29:27–30:00. During oral argument, the government further cited to *United States v. Von Roeder*, 435 F.2d 1004 (10th Cir. 1970), for the proposition that it is "well known" that "the escape from the robbery is part of the robbery crime." *Id.* at 28:50–29:15.

McHenry, for his part, clearly recognized that the government had advanced this post-taking theory below. In response, McHenry devoted an entire section of his opening brief on appeal to arguing that "[t]he statutory robbery offenses charged in

20

this case do not include a separate 'escape phase.'" Aplt. Br. at 22–25.  He sought to clarify that *Von Roeder*, the case that the government later cited at oral argument, "applies only to robbery offenses with asportation elements, not to statutory robbery offenses like federal carjacking and federal enclave robbery that lack the element of asportation." *Id.* at 24.

Accordingly, our decision that the "post-taking" carriage theory supports McHenry's § 924(c)(1)(A) conviction does not require us to "cherry-pick facts" presented to the jury and apply them to a *different* carriage theory. *Ciminelli v. United States*, 598 U.S. 306, 316–17 (2023).  Our decision rests on the *same* carriage theory that the government presented to the jury below:  that McHenry carried his weapon for at least some period of time post-taking.  *See* R. Vol. I at 894 ("He transported [the firearm] from . . . Motel 6 [to] the house in Braggs.").  As such, affirming McHenry's conviction on the post-taking theory does not require us to "assume . . . the function . . . of a jury." *Ciminelli*, 598 U.S. at 317.  Instead, we need only apply the government's theory, which the government presented to the jury, to the facts of this case to uphold McHenry's § 924(c)(1)(A) conviction based on his post-taking flight with a firearm.

## VI.

For the foregoing reasons, we AFFIRM.

21

No. 24-7048, *United States v. McHenry*
**FEDERICO**, Circuit Judge, joined by **McHUGH**, Circuit Judge, concurring.

Following trial, a jury convicted Patrick McHenry of multiple offenses, including for violating 18 U.S.C. § 924(c)(1)(A) for carrying a firearm in connection with a predicate crime of violence. We affirm that conviction today based on the theory that McHenry constructively possessed a shotgun while fleeing the scene of his predicate crime, a theory that stems from *United States v. Lindsey*, 389 F.3d 1334 (10th Cir. 2004). I agree with the majority that the facts here are materially indistinguishable from the facts in *Lindsey*. In *Lindsey*, we affirmed a similar § 924(c)(1)(A) conviction because the defendant maintained constructive possession over his firearm by directing a subordinate to transport the firearm in a U-Haul truck while the defendant rode in a different vehicle close to the U-Haul. *Id.* at 1338–39. Here, as McHenry fled the scene in a stolen car, he likewise instructed someone else (his girlfriend) to follow him in a separate car where the shotgun was contained. As such, McHenry constructively possessed the shotgun, and he possessed it while fleeing.

Had the Government made the argument that the majority now adopts, this would be a much more straightforward case. But the Government did not, so affirming on this basis requires working through tricky waiver questions. I concur because I ultimately conclude that the Government has not waived the

winning argument. I write separately to emphasize that the law governing waivers in these circumstances is underdeveloped, making this case a much closer call than the majority opinion lets on.

Two types of potential waiver are in play. The first is appellate waiver. In its appellate brief, the Government does not cite *Lindsey*, nor does it argue that McHenry carried a firearm while fleeing the scene. It was not until oral argument, and only when prompted by the panel, that the Government first pressed its flight argument on appeal. I am not too concerned about this first type of waiver – we have long said that we have the discretion to affirm on any basis supported by the record, even on a basis not presented on appeal. *United States v. Margheim*, 770 F.3d 1312, 1325 (10th Cir. 2014) (quoting *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011)).

It is the second type of waiver that I find more challenging. For ease of reference, I will refer to it as trial waiver. It arises from the Government's failure to argue to the jury at trial that McHenry constructively possessed the shotgun during his flight when he instructed his girlfriend to follow him in the car that contained the shotgun.

Unlike appellate waiver, we do not have discretion when it comes to trial waiver. The Supreme Court has told us that we "are not permitted to affirm convictions on any theory [we] please simply because the facts necessary to support the theory were presented to the jury." *McCormick v. United States*,

2

500 U.S. 257, 270 n.8 (1991). So, the theory upon which we affirm a conviction must have been presented to the jury. This is because a court that adopts an unpresented theory improperly substitutes itself as factfinder in place of the jury. To satisfy itself that an unpresented theory supports conviction, the court would need to review the evidence in the first instance, which includes making inferences and findings that the jury was never asked to make. *See Ciminelli v. United States*, 598 U.S. 306, 316–17 (2023) ("[T]he Government asks us to cherry-pick facts presented to a jury charged on the right-to-control theory and apply them to the elements of a *different* wire fraud theory in the first instance. In other words, the Government asks us to assume . . . the function . . . of a jury. That is not our role."). Put differently, the Government cannot convince a jury to convict on legally indefensible grounds only to then turn around and ask an appellate court to salvage its case by bootstrapping a valid theory, never argued to the jury, onto the jury's verdict.[1]

Applying *McCormick* and *Ciminelli*, we have no discretion to excuse this potential trial waiver. However, it is somewhat unclear whether or how trial waiver applies in these circumstances. *McCormick*'s rule that appellate courts cannot affirm "on any theory they please" seems to center trial waiver on how

---

[1] This would likely also circumvent the Government's burden of proof, as appellate review is less searching than the reasonable doubt standard a jury was tasked with applying if the Government had presented an appropriate theory at trial.

the Government argued its theory of the case to the jury. 500 U.S. at 270 n.8. Yet, in the immediately preceding sentence, *McCormick* says that a defendant is denied his jury right "when an appellate court retries a case on appeal under different instructions *and* on a different theory than was ever presented to the jury." *Id.* (emphasis added). This suggests that trial waiver depends on both failure to present a particular theory of the case *and* failure to instruct the jury on that theory. *Ciminelli,* too, focused on the jury instructions. There, the Supreme Court declined to affirm on an alternative theory in part because the jury had not been charged on that theory; rather, the jury had been charged on a right-to-control theory that the Supreme Court had rejected. *Ciminelli,* 598 U.S. at 316–17. *McCormick* and *Ciminelli* thus leave open some questions about the scope of trial waiver and how we should apply it.

Absent more definitive guidance, I fall back on the well-worn principle that we do not reverse jury verdicts unless no reasonable juror could have reached the challenged verdict. *United States v. Shepard,* 396 F.3d 1116, 1119 (10th Cir. 2005) (citation omitted). In this case, there was enough, barely, for a reasonable juror to convict on the theory of constructive possession during flight, which is the theory of affirmance on appeal.

The Government argued to the jury that McHenry possessed the shotgun "for the entire relevant period," which necessarily included the moments when McHenry fled from the hotel and his criminal conduct continued. R. I at 894.

4

And the district court instructed the jury on constructive possession, including the fact that McHenry could have constructively possessed the firearm "through another person." *Id.* at 248. Combined with the testimony from McHenry's girlfriend that McHenry did in fact direct her to follow in a separate vehicle with the shotgun, the jury had all the puzzle pieces needed to convict on the theory that the majority opinion adopts. To be sure, the Government never put the pieces together for the jury by specifically arguing constructive possession during flight. But a rational juror could have finished the puzzle without the Government's help. I therefore respectfully concur.